In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-2692

WILLIAM J. BURFORD,

*Plaintiff-Appellant,*

*v.*

ACCOUNTING PRACTICE SALES, INC. and
GARY HOLMES,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:12-cv-1212-JPG-SCW — **J. Phil Gilbert**, *Judge.*

ARGUED DECEMBER 8, 2014 — DECIDED MAY 13, 2015

Before BAUER and HAMILTON, *Circuit Judges*, and ELLIS,
*District Judge.*[*]

---

[*] The Honorable Sara L. Ellis, United States District Judge for the
Northern District of Illinois, sitting by designation.

HAMILTON, *Circuit Judge*. Plaintiff William J. Burford agreed to market and facilitate the purchase and sale of accounting practices on behalf of defendant Accounting Practice Sales, Inc. (APS) in various territories from Kentucky to Louisiana. The parties initially signed one written contract assigning Louisiana to Burford. They later modified this agreement by orally agreeing that Burford should also cover Alabama, Mississippi, Tennessee, and Kentucky. There is some dispute about the precise terms of the oral agreements and/or modifications, but for purposes of this appeal, we treat the parties' entire relationship as being governed by the terms of the written contract.

APS terminated its contract with Burford. He brought suit in an Illinois state court claiming that APS breached the terms of the contract. He also sought to pierce the corporate veil to hold Gary Holmes, the owner of APS, personally liable for any judgment against APS.

APS removed the case to federal court and moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. After Burford's complaint survived the motion to dismiss, APS filed a four-count counterclaim. Relevant here is the count of the counterclaim alleging that Burford misappropriated APS's trade name in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq*. Shortly after APS terminated his contract, Burford started a rival business named "American Accounting Practice Sales." Both sides moved for summary judgment on the opposing side's claims.

APS prevailed on the contract claim on the theory that its contract with Burford was of indefinite duration and was therefore terminable at will. After APS's motion on the con-

tract claim was granted, but before the district court could consider the counterclaim, APS voluntarily dismissed its counterclaim with prejudice. As the prevailing party on the Lanham Act claim, Burford then sought attorney fees under 15 U.S.C. § 1117(a), arguing that APS's pursuit of a meritless Lanham Act claim until right before trial amounted to the sort of abuse of process that entitled Burford to fees. The district court denied this motion, reasoning that APS's Lanham Act claim could have been pursued by a rational party seeking to protect its trademark.

Burford appeals the grant of summary judgment on the contract claim and the denial of his request for attorney fees under the Lanham Act. We reverse the grant of summary judgment but affirm the denial of attorney fees. The contract provided that it could be terminated by APS *only* if Burford violated the terms of the agreement. Thus, even if the contract was indefinite in duration, the parties contracted around the default rule making such contracts terminable at will by either party. On the Lanham Act issue, the district court did not abuse its discretion by denying Burford's request for fees.

I. *Contract Interpretation*

We review *de novo* the district court's interpretation of a written contract, including its conclusion that the contract was terminable at will. See *BKCAP, LLC v. CAPTEC Franchise Trust 2000-1*, 572 F.3d 353, 358 (7th Cir. 2009). Illinois law governs the contract in this diversity jurisdiction case. See *A.T.N., Inc. v. McAirlaid's Vliesstoffe GmbH & Co. KG*, 557 F.3d 483, 485 (7th Cir. 2009). Under Illinois law, our primary task is "to determine and give effect to the intent of the parties as expressed in the language" of the contract. *Id.*, quoting *Clay-*

*ton v. Millers First Ins. Cos.*, 892 N.E.2d 613, 615 (Ill. App. 2008); see also *Jespersen v. Minn. Mining & Manufacturing Co.*, 700 N.E.2d 1014, 1017 (Ill. 1998) ("in general, individuals should be free to order their affairs subject to important qualifications for instances of fraud, duress, or undue influence"). As an interpretive guide, we rely on background principles of contract law to fill in the details when the parties were silent. See, e.g., *Jespersen*, 700 N.E.2d at 1017 (relying on default presumption that indefinite contracts are terminable at will when contract is silent on issue).

We agree with the district court that the contract here was of indefinite duration. The agreement provided that after it went into effect, "it renews automatically on each anniversary date of this agreement for another period of twelve months." The fact that the initial contract was for a twelve-month period did not make it for a definite period. By its terms, the agreement would renew itself without the need for either party to take action, and there appears to have been no way for the parties to prevent automatic renewal. Because the parties provided that the contract would renew perpetually, there was no objective event upon which the agreement would terminate. It was therefore of indefinite duration. See *R.J.N Corp. v. Connelly Food Products, Inc.*, 529 N.E.2d 1184, 1187 (Ill. App. 1988) (a contract has a definite duration only if it can be read to terminate upon the occurrence of an objective event).

Under Illinois law, perpetual contracts are disfavored, so the law presumes that such contracts are terminable at will by either party. *Jespersen*, 700 N.E.2d at 1015 ("It has long been recognized that contracts of indefinite duration are generally terminable at the will of the parties."). That is,

when the parties agree to a contract of indefinite duration, courts assume that they intend for the contract to be terminable at will. *Id.* at 1017. This does not mean that Illinois law forbids parties from making contracts of indefinite duration; Illinois law merely disfavors them and assumes that most contracting parties do too. *Id.*

This presumption in favor of indefinite contracts being terminable at will can be overcome if the parties clearly agree to place limits on when termination may take place. The Illinois Supreme Court made this clear in *Jespersen* itself: "An agreement without a fixed duration but which provides that it is terminable *only* for cause or upon the occurrence of a specific event is in one sense of indefinite duration, but is nonetheless terminable only upon the occurrence of the specified event and not at will." 700 N.E.2d at 1016. We acknowledged the same point in *Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH*, 392 F.3d 881, 885 (7th Cir. 2004), where we recognized the terminable-at-will presumption but held that parties could avoid the presumption with a clear agreement to the contrary, as they had in that case. We described the presumption as "the business equivalent of no-fault divorce, with the possibility of covenant marriage if the parties make the necessary declarations." *Id.*

Consistent with these principles, courts facing contracts of indefinite duration have been called upon to determine whether the parties intended to circumscribe their default rights to terminate at will. This question calls for close parsing of the contract language. Compare *Donahue v. Rockford Showcase & Fixture Co.*, 230 N.E.2d 278, 281 (Ill. App. 1967) (contract not terminable at will when parties could terminate *only* if specified sales goals were not met), with *Jespersen*, 700

N.E.2d at 1016–17 (contract terminable at will when parties could terminate for specified but non-exclusive instances of material breach), and *A.T.N.*, 557 F.3d at 487 (contract terminable at will when either party could terminate by simply stopping purchases or sales).

These principles guide our decision on whether this contract allowed APS to terminate it at will. The intentions of the parties regarding APS's termination rights are found in the very last sentence of the agreement: "APS cannot terminate this agreement *unless it is violated by Burford*." (Emphasis added.) The plain reading of this statement, and the only one that avoids rendering it meaningless, is that APS could terminate the agreement if—but only if—Burford had breached it. This is the clear statement that *Jespersen* and *Baldwin Piano* explained could keep a contract of indefinite duration from being terminable at will. By allowing APS to terminate only when Burford had breached, the contract made as clear as could be that APS could not terminate the contract at will. By way of comparison, the contract expressly provided that Burford could terminate the contract at any time on thirty days' notice. The parties knew how to give a party the right to terminate at will. They chose to give that right to Burford but not to APS.

The district court found this language insufficient to overcome the presumption expressed in *Jespersen* and other cases that the parties intended to allow APS to terminate the agreement at will. In its view, the provision merely stated the obvious: APS could terminate the agreement if Burford breached it. Such provisions do nothing to limit the right to terminate at will because, unless the parties provide otherwise, "*any* contract is terminable upon the occurrence of a

material breach." *Jespersen*, 700 N.E.2d at 1016; see also *Profile Products, LLC v. Soil Management Technologies, Inc.*, 155 F. Supp. 2d 880, 883 (N.D. Ill. 2001). Repeating what would be true even if unstated does nothing to alter the presumption that agreements of indefinite duration are terminable at will.

The district court's reasoning would be persuasive if the contract had said "APS may terminate this agreement if it is violated by Burford," or if, as in *Jespersen*, it merely contained a "permissive and nonexclusive termination provision" that specified instances of material breach. See 700 N.E.2d at 1016–17. But it did not. It said APS could terminate the contract only if Burford violated it. There is a decisive difference between saying that A may terminate if B breaches and saying that A may terminate *only* if B breaches. Here, the difference is between reading a sentence out of a contract or not, see *Baldwin Piano*, 392 F.3d at 883 (cautioning against interpreting contracts so that major clauses fall out), and between the right to terminate at will or only for cause.

APS's interpretation of this provision would threaten to deprive Burford of the economic basis for the bargain he struck. As we said in *Baldwin Piano*, "courts should not demolish the economic basis of bargains that would be sound if the contract were given a natural reading." 392 F.3d at 883–84. The type of relationship found here—where a sales representative builds a territory on the other party's behalf—poses significant risks to both sides if either party is free to walk away at any time without consequence. The economic incentives and risks associated with this sort of relationship can be complex, especially over many years. See *id*. at 885. And given this complexity, of course, parties may navigate these risks in innumerable ways.

In this case, the principal economic risks are evident. So are the contractual provisions protecting each side from exploitation by the other. If Burford could walk away at any time, he could use his time at APS to build goodwill in his territories, only to leave APS and capitalize on that goodwill with another company or for himself. If APS could walk away at any time, it could wait until Burford had built up the territories, and then, without much loss to itself, reassign the territory to someone it could pay less. At the same time, APS also needed protection from the risk that its exclusive representative in a territory might perform poorly.

The agreement anticipated these possibilities and reduced the risk that they would come about in three principal ways. First, it protected APS by subjecting Burford to a one-year non-compete clause after termination. Second, it protected Burford by providing that APS could not terminate the contract so long as he did not violate the agreement. Third, at the same time, it protected APS if Burford's performance as an exclusive representative was not satisfactory because poor sales performance constituted a good cause for which APS could terminate Burford and replace him with someone else. From APS's perspective, it did not matter that Burford could terminate at will because he was otherwise prevented from capitalizing immediately on goodwill he had built up while working for APS.

Based on the clear statement that APS could not terminate the agreement unless Burford violated it, we conclude that the district court erred in granting summary judgment for APS on Burford's contract claim. Both the text of the agreement and the context in which it was signed show that APS could not terminate at will. In both the district court

and on appeal, APS's sole argument for summary judgment was that the contract was terminable at will. Absent APS's ability to terminate the agreement at will, then, the contract claim survives APS's motion for summary judgment.[1]

II. *Lanham Act Attorney Fees*

Burford also argues that the district court abused its discretion by failing to award him attorney fees under the Lanham Act after APS dismissed its claim with prejudice. District courts may award attorney fees to those prevailing under the Act in "exceptional cases." 15 U.S.C. § 1117(a)(3). When the party bringing the claim—here APS—does not prevail, it is an "exceptional case" within the meaning of the Act if the decision to bring the claim can be called an abuse of process. *Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 626 F.3d 958, 963–64 (7th Cir. 2010) (explaining when prevailing defendants and plaintiffs can obtain attorney fees under the Act). It is enough for there to be an abuse of process when the claim was objectively unreasonable because it is one "a rational litigant would pursue only because it would impose disproportionate costs on his opponent." *Id.* at 965. It could also be enough to show an abuse of process if there were direct evidence that APS sought to "bring a frivolous claim in order to obtain an advantage unrelated to obtaining a favorable judgment," though such evidence is not required for a litigant to be entitled to fees. See *id.* at 965–66

---

[1] This appeal has not required us to consider Burford's attempt to pierce APS's corporate veil to hold Holmes liable for a breach. Nor have we needed to determine whether the oral agreements are subject to the same terms as the written agreement. Those may be questions for the district court in due course.

(finding that plaintiff had made Lanham Act claim solely to coerce a price reduction out of defendant). Applying the *Nightingale* standard here, the district court concluded that APS's decision to bring the claim did not amount to an abuse of process. Burford failed to persuade the district court that pursuit of the claim was objectively unreasonable or was intended to harass or to obtain an advantage unrelated to winning a favorable judgment.

The decision whether to award Lanham Act attorney fees is left to the district court's sound discretion. *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1099 (7th Cir. 1994). Burford argues that the district court abused its discretion because APS's Lanham Act claim was nothing more than an attempt to impose costs on him solely to gain a competitive advantage and to push him out of the market. See *Nightingale*, 626 F.3d at 962. In Burford's view, APS's actions were objectively unreasonable because it chose to pursue the claim for as long as it possibly could—so as to impose more costs—before voluntarily dismissing, even though it knew it had no evidence supporting its claim.

Two reasons, taken together, show that the district court did not abuse its discretion by rejecting this argument. First, APS's voluntary dismissal of its claim right before trial says nothing definitive about its view of the merits or about its reasons for filing the counterclaim in the first place. APS sought dismissal of its claim immediately after it won summary judgment on Burford's contract claim, so dismissal of the counterclaim would allow APS simply to walk away from the case without further expense or effort. Absent that grant of summary judgment, though, APS told the district court, it would have pursued its Lanham Act claim through

trial if necessary. All the voluntary dismissal shows, then, is that APS believed the economic benefits it might have obtained from bringing the Lanham Act claim—whether in the form of damages or the monetary value of forcing Burford to stop using "American Accounting Practice Sales" in the marketplace—did not outweigh the costs of going to trial once Burford's contract claim was out of the suit.

It can be perfectly rational to pursue a counterclaim when you already have to spend time and money defending other claims in a case, yet to think the counterclaim is not worth the effort after your opponent's claims drop out. As far as we can tell from this record, APS had little interest in pursuing a stand-alone Lanham Act claim, let alone for extortionate reasons, even though it might reasonably have thought the counterclaim worth pursuing if it had to be in court anyway. If the motive behind APS's suit had been only to impose litigation costs on a new entrant in the market, it certainly could have imposed more costs on Burford by forcing him to continue defending the Lanham Act claim until the case reached its bitter end. It did not do so.

Second, Burford's suggestion that APS has not supported its claim with evidence—and thus must have pursued for extortionate reasons a claim it knew it would lose—also is not supported by the record. To have any chance of prevailing on its claim, APS would need to offer evidence that its mark was protectable and that APS's customers would likely confuse Burford's services with its own because of their similar names. See *Door Systems, Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 173 (7th Cir. 1996). Burford points out that APS's initial Rule 26 disclosures contained no information about APS's counterclaim. That's not surprising since APS pre-

pared those disclosures before it filed the counterclaim. APS's later interrogatory answers and its summary judgment filings show, however, that APS was prepared to offer evidence in support of its trademark claim. Given APS's readiness to offer evidence on its claim, the district court did not abuse its discretion in finding that APS's claim was not frivolous.

As to the first element—whether the mark was protectable—APS offered evidence in the form of dictionary definitions and advertisements by others in the business of brokering accounting practices that "Accounting Practice Sales" is descriptive rather than generic. See *id.* at 171–72 (explaining that dictionaries and advertisements can be consulted to determine whether mark was generic). APS also suggests it would have been able to establish that its mark had taken on secondary meaning for customers as a result of its extensive dealings in the accounting practice brokerage market. See *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 641 (7th Cir. 2001); *G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 998 n.12 (7th Cir. 1989). APS also would have argued that Burford's intentional copying of the phrase showed that it had secondary meaning in the marketplace. See *Packman*, 267 F.3d at 641.

We are skeptical about whether APS's mark is protectable. "Accounting Practice Sales, Inc." seems closer to an unprotected description of the business than a designation of origin based on secondary meaning that would prevent Burford from using the name "American Accounting Practice Sales." (Consider the difference between "Widgets, Inc." and "American Widgets, Inc.") And as Burford notes, APS did not have the most helpful type of evidence of secondary

meaning—market studies and consumer testimony—though it is also true that such evidence is not strictly required to establish secondary meaning. See *Platinum Home Mortgage Corp. v. Platinum Financial Group*, 149 F.3d 722, 728 (7th Cir. 1998). Despite our skepticism, though, we do not believe the district court abused its discretion by seeing at least a good-faith basis for APS's argument that its mark was protected.

On the likelihood-of-confusion issue, the district court could similarly find at least a good-faith basis for APS to argue that consumers would be confused. APS would have provided evidence about how the two businesses' markets overlap, the similarity of the two names and business models, and Burford's attempts to pass off his services as those of APS. See *Forum Corp. of N.A. v. Forum, Ltd.*, 903 F.2d 434, 439 (7th Cir. 1990).

Without deciding the ultimate merits of APS's Lanham Act claim, we find no abuse of discretion by the district court in finding that it was not objectively unreasonable for APS to have brought the claim in the first place. That is, a rational litigant might bring this claim at least in substantial part to protect its trademark. Thus, we cannot presume that the only reason APS pursued this claim was to impose costs on Burford. Nor is there direct evidence that APS brought suit solely to obtain an economic benefit for itself unrelated to winning the suit. Cf. *Nightingale*, 626 F.3d at 965–66 (finding that plaintiff had made Lanham Act claim solely to coerce a price reduction out of defendant).

Accordingly, we REVERSE the grant of summary judgment to defendants on the contract claim and REMAND for further proceedings consistent with this opinion. We

AFFIRM the district court's denial of Burford's request for attorney fees on the Lanham Act counterclaim.