In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1871

ESTATE OF WILLIAM J. BURFORD,

*Plaintiff-Appellant,*

*v.*

ACCOUNTING PRACTICE SALES, INC. and GARY L. HOLMES,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 12-cv-01212-JPG-SCW — **J. Phil Gilbert**, *Judge.*

ARGUED JANUARY 12, 2017 — DECIDED MARCH 13, 2017

Before BAUER, SYKES, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Defendant Accounting Practice Sales (APS) terminated its brokerage contract with William Burford after he failed, in his exclusive territory for APS, to meet his minimum yearly sales volume for four consecutive years. Burford sued. APS defended on the grounds that Burford failed to meet his sales requirement and that his contract was terminable at will. The case was tried after an earlier appeal in the case, and the jury ruled in favor of APS. While this

appeal by Burford was pending, he passed away. His estate has carried on the appeal, arguing that the district court erred by permitting APS to defend on the basis of Burford's failure to meet his sales volume requirement, by refusing to admit an exhibit, and by refusing to order a new trial on the theory that the jury verdict was contrary to the weight of the evidence as to whether APS waived its right to terminate the contract. None of these arguments warrants a new trial. We affirm the judgment of the district court in favor of APS.

I.   *Factual and Procedural Background*

Defendant APS acts as a broker for the purchase and sale of accounting practices. APS works through brokers who are treated as independent contractors and are assigned exclusive sales territories for APS. The brokers and APS share commissions for successful sales. Plaintiff Burford became a broker for APS in 2003, and over the next several years, he and APS agreed to add additional states as part of his exclusive territory. Burford's contract included a "minimum yearly sales volume" requirement. On appeal, the parties do not dispute that Burford did not meet this requirement for four consecutive years.

In March 2010, APS owner Gary Holmes spoke with Burford about his poor performance. Burford acknowledged that he needed to improve, but he failed to meet his minimum yearly sales volume requirements again in 2010 and 2011. In 2012, APS terminated Burford's contract and reassigned his sales territory.

Burford brought suit in an Illinois state court, claiming that APS breached his contract by terminating it without the required good cause. He also sought to pierce the corporate

veil to hold Holmes personally liable for the breach. The district court granted summary judgment in favor of the defendants on the theory that Burford's contract with APS was terminable at will. In the earlier appeal, we reversed on that point, finding that the contract's provision that "APS cannot terminate this agreement unless it is violated by Burford" meant that the contract was not terminable at will. *Burford v. Accounting Practice Sales, Inc.*, 786 F.3d 582, 587–88 (7th Cir. 2015). We remanded for trial on the contract claim. The jury found for APS, and the district court entered judgment on the verdict.

On appeal, Burford raises three issues. First, he claims that the trial court erred by supposedly allowing APS to change the legal theory for its defense in violation of the "mend-the-hold" doctrine in Illinois law. Second, Burford argues that the district court abused its discretion by denying admission of an exhibit. Third, he claims that the jury's verdict was contrary to the weight of the evidence on whether APS waived its right to enforce the minimum sales requirement.

II. *Analysis*

A. *"Mend the Hold"*

Burford's first argument on appeal is that APS should not have been allowed to assert its defense that it terminated Burford's contract for good cause since he had missed his minimum sales requirements for several years. Burford's theory is a variation of the "mend-the-hold" doctrine in Illinois law. That doctrine, which takes its name from a nineteenth-century wrestling phrase, is less a set of rules than a flexible concept of equity. It prevents one party to litigation, especially in

contract disputes, from trying to change its position or theories at such a late stage in the dispute as to cause unfair prejudice to the opposing party. See *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362 (7th Cir. 1990) ("[W]here a party gives a reason for his conduct and decision touching any thing involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold."), quoting *Ohio & Mississippi Railway Co. v. McCarthy*, 96 U.S. 258, 267–68 (1877); see also *Ryerson Inc. v. Federal Ins. Co.*, 676 F.3d 610, 614 (7th Cir. 2012) (collecting cases); *Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1251 (7th Cir. 1996); *FHP Tectonics Corp. v. American Home Assurance Co.*, 57 N.E.3d 575, 587–88 (Ill. App. 2016) (declining to apply doctrine in absence of unfair surprise or arbitrariness). The doctrine seems to correlate fairly closely to federal courts' approach to efforts to amend pleadings under Federal Rule of Civil Procedure 15. The doctrine also lies close to the boundary between matters of substance and procedure for purposes of *Erie Railroad Co. v. Tompkins*. See *Harbor Insurance*, 922 F.2d at 363–65.

Whatever the scope of the mend-the-hold doctrine, and whether it is procedural or substantive, it does not help Burford in this case. From its earliest discovery responses, APS advanced two central arguments in defense: first, it terminated Burford's contract for good cause because he failed to meet his minimum yearly sales volume, and second, the agreement was terminable at will. Dkt. No. 129, Ex. 1 at 4 (response to interrogatories).

Burford bases his mend-the-hold argument on the strategy APS pursued, but that strategy was perfectly reasonable

and not unfair in any way to Burford. It is easy to imagine that a motion for summary judgment based on Burford's failure to meet his sales volume requirements could quickly bog down in disputes about accounting, waiver, and competing equities. APS chose instead to move for summary judgment on the narrow ground that its contract with Burford was terminable at will. There was nothing unfair or unsound about that strategic choice, and the district court granted summary judgment for APS on that basis. We reversed in the earlier appeal, holding that the contract was not terminable at will. *Burford*, 786 F.3d at 588.

It is not unusual or unfair for a defendant who believes he has a solid legal defense to assert that defense first in a Rule 12(b)(6) motion or summary judgment motion in the hope of winning an early and relatively inexpensive victory. Filing either sort of motion simply does not waive other defenses that may be available to that party. (Consider for a moment the consequences of a contrary ruling on that point, treating as waived a substantive defense that the defendant did not include in a summary judgment motion. That rule would create powerful incentives for defendants to load up summary judgment motions with all of their defenses, including theories that would have no hope on summary judgment even though they might be winners at trial. Imagine the costs and burdens for civil litigation, in return for no apparent benefit. And Rule 56 has no such waiver rule, as compared to Rule 12(h).)

In the trial after remand, APS pursued its alternative, more fact-centered defense, arguing that it had good cause to terminate the contract because Burford had failed for several years to meet his minimum yearly sales volume. Burford attempted to block this route, arguing in a motion in limine that

APS could not assert any defense other than the terminable-at-will defense without violating the "mend-the-hold" doctrine. The district court denied that motion. Burford's claim went to trial, and the jury returned a verdict in favor of APS.

Even the most aggressive versions of the mend-the-hold doctrine would not block APS from proving it had good cause to terminate Burford's contract. APS did not change its defense. APS maintained two defense theories from the start, and they are not inconsistent with each other (though a party is allowed to pursue even inconsistent theories for its claims or defenses, see Fed. R. Civ. P. 8(d)). In addition, there was no prejudice to Burford, who was not surprised by APS's argument that it terminated him for cause. See Dkt. No. 73 at 3 (transcript from Nov. 1, 2013 pretrial conference where Burford's counsel identified cause to terminate as a key issue); see also *Ryerson Inc.*, 676 F.3d at 614 ("When there is no prejudice to the opposing party, invoking the doctrine of mend the hold to bar a valid defense is overkill."). The district court did not err by allowing APS to defend its termination for cause.

B. *Trial Exhibit 13*

Burford next argues that the district court erred when it did not admit his Exhibit 13, which was a document that Gary Holmes sent to APS brokers in 2010 to answer frequently asked questions about APS's proposed transition into a franchise operation. One answer in the document said: "There will be a minimum production requirement. This has been discussed but never really enforced. But it is time that territories all be productive. This will not affect all brokers but will some." While Burford had rejected APS's franchise overtures, he argues the document was nonetheless relevant to show that APS had waived its right to enforce its minimum yearly

sales requirement. We review such an evidentiary ruling only for abuse of discretion. *Morgan v. City of Chicago*, 822 F.3d 317, 338 (7th Cir. 2016).

The district court did not abuse its discretion by denying admission of Exhibit 13. Federal Rule of Evidence 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … undue delay, wasting time, or needlessly presenting cumulative evidence." While Exhibit 13 may have been relevant, its exclusion was not an abuse of discretion because it would have been needlessly cumulative.

Burford sought to introduce Exhibit 13 to prove that APS had not previously enforced the minimum sales volume requirement in his contract. His theory was that APS had waived its right to terminate for such failures. Burford argued that Exhibit 13 "related only to what APS had admittedly done previously in not enforcing any minimum production requirement." However, this point was not in real dispute. The issue at trial was not whether APS had enforced the minimum yearly sales volume in the past; it clearly had not. Gary Holmes himself readily testified to this effect. The real dispute at trial was whether APS's earlier failure to enforce the sales requirement amounted to an implicit waiver of its right to enforce the sales requirement later.

Burford himself acknowledged that APS's past non-enforcement was well established at trial: "there was ample and conclusive testimony at trial to establish that APS had waived the minimum yearly sales volume." Whether the earlier failure to enforce minimum sales requirements amounted to a waiver was controversial, but not the point from Exhibit 13 that the requirements had not been enforced in the past. Since

this point was already established, it was not unreasonable for the court to exclude Exhibit 13 as cumulative under Rule 403, and Burford's substantial rights were not affected by the exclusion. See Fed. R. Civ. P. 61.

C.  *Sufficiency of the Evidence*

Finally, Burford argues that the jury's verdict was contrary to the weight of the evidence because there was "overwhelming and indisputable evidence of waiver." Waiver is "the intentional relinquishment of a known right, [and it] can arise either expressly or by conduct inconsistent with an intent to enforce the right." *Wald v. Chicago Shippers Ass'n*, 529 N.E.2d 1138, 1147 (Ill. App. 1988) (Illinois contract law). Burford sought to establish waiver by showing that APS could have terminated him sooner but did not do so.

We review for abuse of discretion the district court's ruling on a Rule 59 motion for a new trial. *Davis v. Wisconsin Dep't of Corrections*, 445 F.3d 971, 979 (7th Cir. 2006), citing *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995). A new trial should be granted "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Id.*, citing *Latino*, 58 F.3d at 314.

There was sufficient evidence here for the jury to find that APS did not waive its right to terminate Burford. The contract gave APS the option to terminate its contract with Burford if he failed to meet certain thresholds. It did not *require* APS to fire Burford in such instances. When we last considered this contract, we said: "APS could terminate the contract only if Burford violated it. There is a decisive difference between saying that A may terminate if B breaches and saying that A may

terminate *only* if B breaches." *Burford*, 786 F.3d at 587. At that point, we made this distinction to show that APS could fire Burford only for cause, not at will.

Those same terms in the contract illustrate a different but equally valid point: saying that A *may* terminate if B breaches does not mean A *must* do so immediately or else lose forever the right to terminate. Adopting Burford's theory of this contract would lead to perverse results. In any case of material breach, the non-breaching party would need to terminate the contract promptly or forever waive the right to terminate. Such a draconian approach would destabilize commercial relationships where breaches may be tolerated for a host of reasons, from the difficulty in finding substitutes to recognizing headwinds from macroeconomic troubles, or to humane reasons like excusing Burford's failure to record any sales in a year when he had serious health problems.

At trial, APS's Holmes testified to such reasons. He said he did not terminate Burford's contract earlier because he "wanted to be fair" and wanted "to give him a chance" to improve his performance. Holmes noted that Burford had received surgery in one year, and that 2008 was a bad economic time for everyone. During another year, Burford was involved in a lawsuit, which had evidently taken up much of his time. For these reasons, Holmes testified, APS gave Burford multiple chances to improve his performance. When Burford continued to struggle, Holmes ultimately had a "heart-to-heart" with him in 2010 before terminating his contract at the beginning of 2012. The jury was not required to accept APS's explanation, but given this and other evidence offered at trial, the jury's verdict that APS had not waived its right to terminate

Burford was certainly not contrary to the weight of the evidence.

This result is entirely consistent with our reasons for reversing in the earlier appeal and finding that the contract was not terminable at will. It made good sense for the parties to agree that Burford would have an exclusive territory and that his contract could be terminated only for cause. Otherwise, APS could have watched while Burford built up his territories and then terminated his contract, grabbing for itself all the fruits of his labors. 786 F.3d at 587–88. At the same time, if a manufacturer or other upstream company like APS agrees to give a sales representative an exclusive territory, its right to terminate for poor performance is critical. Without that right, it risks effectively abandoning the territory, unable to replace the poor performer in his exclusive territory. For that reason, neither courts nor juries should quickly find waiver when the manufacturer or upstream company tolerates poor performance but ultimately loses patience and terminates the contract for the exclusive territory.

The judgment of the district court is AFFIRMED.