2023 IL App (1st) 211668-U

FIRST DISTRICT,
FIRST DIVISION
February 27, 2023

No. 1-21-1668

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| APS HOLMES GROUP, LLC, d/b/a/ ACCOUNTING PRACTICE SALES, | ) ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 2019 L 13687 |
| SAMUEL SORKIN, | ) ) | Honorable James E. Snyder, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Justice Pucinski concurred in the judgment.
Justice Hyman specially concurred.

**ORDER**

¶ 1     *Held*:   (1) Defendant failed to raise issues of material fact as to whether plaintiff materially breached contract and whether plaintiff provided him with a written disclosure document as required by the Business Brokers Act. (2) Trial court acted within its discretion in denying defendant's motion for leave to amend his affirmative defenses.

¶ 2     Defendant Samuel Sorkin retained plaintiff, APS Holmes Group, LLC ("APS"), to

market and sell his accounting practice. APS put Sorkin in contact with multiple prospective

buyers but unilaterally terminated the agreement before a purchase deal was finalized. Sorkin subsequently sold his practice to a buyer disclosed to him by APS.

¶ 3     APS brought a breach of contract suit against Sorkin, seeking 10% of the sale fee pursuant to the parties' agreement. The parties filed cross-motions for summary judgment. The trial court denied Sorkin's motion, granted APS's motion, and entered judgment for APS. We affirm.

¶ 4                                          BACKGROUND

¶ 5     On May 11, 2017, Sorkin retained APS to sell his accounting practice, Samuel Sorkin CPA ("Sorkin CPA"). The contract provided that APS had the exclusive right to sell, merge, transfer, and/or convey Sorkin CPA, and Sorkin would pay APS a "performance fee" of 10% of the sales price, with a minimum of $15,000. The contract further provided:

> "2. *** The performance fee shall be due and payable *** if the Practice is sold, conveyed, merged or transferred into another practice or entity, or in any manner transferred (I) within the terms of the Agreement regardless of Buyer or other transferee, or (II) within three (3) years after the termination of this Agreement if Buyer or other transferee is one with whom Seller or APS had negotiations or contact regarding the sale or transfer of the Practice during the term of this Agreement."

¶ 6     APS marketed Sorkin's practice and received interest from "around 20 to 30" buyers. Trent Holmes, Sorkin's primary contact at APS, identified the "strongest prospects"—including SanKon Financial Services, Inc. ("SanKon")—and forwarded their contact information to Sorkin in an email dated June 1, 2017. Prior to that email, Sorkin had no knowledge of SanKon.

¶ 7     Sorkin negotiated with various buyers and received multiple letters of intent (LOIs), including a $300,000 offer from SanKon. Sorkin then asked Holmes to obtain new LOIs from

SanKon and two other prospective buyers who had already provided LOIs, intending "to have the buyers compete against each other" and "create a bidding war" between them. Holmes refused because "it's just not our practice to just go back to buyers and say give us a new LOI *** [when] we already have the LOIs on the table." He "felt like it was actually in both of our best interests to terminate the sales consulting agreement" because on multiple occasions Sorkin "degraded" him, expressed displeasure with his work, and "tr[ied] to tell [him] how to do [his] job."

¶ 8       On September 6, 2017, Holmes sent Sorkin an email stating: "I believe this relationship has run [its] course. Please consider this date as the effective date for terminating our sales consulting agreement." Later that same day, Sorkin replied: "No problem. The only Buyer you are entitled to receive a Performance Fee for is [Demarco Sciacotta Wilkens & Dunleavy]." (In his deposition, Sorkin stated that his email "[m]eans I agreed to terminating the contract" and that "[a] performance fee was owed only if Holmes brought to me a contract I was satisfied with and I signed it.") Holmes sent Sorkin a reply stating: "Your statement couldn't be further from the truth. Please review our sales consulting agreement, attached, specifically sections 2 & 3."

¶ 9       On October 23, 2017, Sorkin CPA and SanKon executed an Asset Purchase Agreement in which SanKon purchased "substantially all of the assets of Sorkin CPA" for $300,000.

¶ 10      On December 12, 2019, APS filed a breach of contract suit against Sorkin, alleging that he breached the agreement by failing to pay a performance fee of 10% of the sales price of Sorkin CPA.[1] Pursuant to the contract, APS also sought attorney fees and costs of bringing the action.

---

[1] APS also brought claims for unjust enrichment and quantum meruit which it later voluntarily dismissed.

¶ 11        Sorkin filed an answer in which he asserted the following affirmative defense: "APS unilaterally terminated the Agreement despite there being no right under the Agreement for ATS [*sic*] to terminated [*sic*]. As a result, APS has forfeited any claim to a Performance Fee as the sale occurred after the termination of the Agreement and the sale was obtained solely by the efforts of Sorkin."

¶ 12        The parties filed cross-motions for summary judgment. APS argued it was entitled to summary judgment because (1) it performed its contractual duty to facilitate the sale of Sorkin CPA when it "brought SanKon as a prospective buyer to Sorkin," and (2) Sorkin breached the agreement by failing to pay APS its performance fee. APS additionally argued that it did not "forfeit" its performance fee by terminating the agreement, which was terminable at will by either party and "does not contain any language preventing APS from terminating the Agreement." (Emphasis in original.)

¶ 13        Sorkin, in his motion for summary judgment, argued that APS was estopped from enforcing the agreement because it committed material breaches by (1) refusing to comply with his request to obtain new LOIs from prospective buyers and (2) unilaterally terminating the agreement in contravention of section 4, which he argued gave him exclusive power to terminate the contract:

>          "4. TERM OF AGREEMENT: This agreement shall commence on the day and
> year set forth below and continues for a MINIMUM period of ninety (90) days from the
> date of this agreement. This agreement shall automatically renew for consecutive fifteen-
> day periods until Seller gives APS written notice of intent to cancel."

Sorkin additionally argued that the contract was invalid and unenforceable because APS failed to provide him with a written disclosure document prior to signing as required by section 10-30 of the Illinois Business Brokers Act of 1995 (BBA) (815 ILCS 307/10-30 (West 2016)).

¶ 14    On June 3, 2021, APS filed a motion to partially strike Sorkin's motion for summary judgment, or in the alternative, for leave to take additional discovery. Specifically, APS sought to strike Sorkin's "unpleaded affirmative defenses of estoppel and contract voidness." In the alternative, APS "request[ed] leave to take discovery on these newly-raised affirmative defenses pursuant to Illinois Supreme Court Rule 191(b)." In support, APS attached an affidavit from Holmes stating: "[I]n the event this court allows Sorkin to pursue his newly asserted affirmative defenses, APS will require discovery of material facts." He identified multiple factual issues allegedly necessitating discovery, including "discovery of material facts to determine whether the exemptions to the [BBA] disclosure requirements apply."

¶ 15    On June 28, 2021, Sorkin moved for leave to amend his affirmative defenses to assert estoppel and failure to comply with the BBA, consistent with his summary judgment motion.

¶ 16    On July 21, 2021, the trial court denied APS's motion to partially strike Sorkin's summary judgment motion "on the grounds that the court will address any arguments raised therein as part of the summary judgment briefing." The court did not rule on Sorkin's motion for leave to amend.

¶ 17    APS filed a reply in support of its summary judgment motion in which it argued that "Sorkin's BBA defense is indisputably false." In support, it attached a second affidavit from Holmes attesting that on February 2, 2017, prior to execution of the agreement, he sent Sorkin an email containing a BBA disclosure statement. "Approximately 5 minutes" after he sent Sorkin the email, Sorkin sent him a reply, "thereby confirming that Sorkin had received [the] prior email

containing the Illinois Disclosure Statement." Attached is a "true and correct" copy of the February 2, 2017 email from Holmes to Sorkin stating, "I've attached our sales consulting agreement and accompanying Illinois Disclosure Statement. Based on everything you've sent, this should be the last piece we'll need in order to get started." Sorkin replied, "Ill [*sic*] give you a call tomorrow after 3."

¶ 18    On September 9, 2021, the trial court granted APS's motion for summary judgment, denied Sorkin's motion, and entered judgment for APS in the amount of $30,000. The court additionally granted APS leave to file a petition for attorney fees and costs.

¶ 19    Sorkin brought a motion to reconsider, arguing, among other things, that the trial court's calculation of damages was incorrect and that the court failed to rule on his pending motion for leave to amend his affirmative defenses. On October 5, 2021, the trial court granted reconsideration on the issue of damages and entered judgment for APS in the amount of $27,627.96. The court denied Sorkin's motion for leave to amend, finding that the affirmative defenses were "not well pled in a factual basis" and "you can't create a question of fact just merely by stating something in the pleading *** when you haven't any evidence," since Sorkin did not attest that he did not receive a BBA disclosure. The court subsequently granted APS's petition for attorney fees and costs in the amount of $24,396.80.

¶ 20                                    ANALYSIS

¶ 21    We review the trial court's grant of summary judgment *de novo* (*Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008)), keeping in mind that summary judgment is appropriate where "there is no genuine issue as to any material fact *** the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2–1005(c) (West 2018). We construe the record strictly against the movant and liberally in favor of the nonmoving party. *Williams*, 228 Ill. 2d at 417. To avoid

summary judgment, the nonmoving party must present evidence that would arguably entitle him to prevail at trial. *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 472 (2010).

¶ 22                                    Material Breach

¶ 23        Sorkin argues that APS is estopped from enforcing the agreement due to materially breaching it. "[A] party seeking to enforce [a] contract has the burden of proving that he has substantially complied with all the material terms of the agreement." *Goldstein v. Lustig*, 154 Ill. App. 3d 595, 599 (1987). "A party who materially breaches a contract cannot take advantage of the terms of the contract which benefit him, nor can he recover damages from the other party to the contract." *Id.*; see also *McBride v. Pennant Supply Corp.*, 253 Ill. App. 3d 363, 369 (1993) ("if [defendant] did materially breach the Agreement it could not take advantage of the terms of the Agreement which benefited it").

¶ 24        Sorkin argues that APS breached the agreement by refusing his request to obtain new LOIs from prospective buyers who had already provided LOIs, which he characterizes as "refusing to market and sell Sorkin's practice." The record reflects that APS marketed Sorkin's practice to prospective buyers across the state and obtained "a plethora of offers from buyers that had great interest in the practice," including SanKon, which made a purchase offer of $300,000. APS forwarded SanKon's contact information to Sorkin, who sold his practice to SanKon within three years of the agreement's termination. The contract does not require APS to employ specific marketing tactics or follow Sorkin's directives thereof; it states that APS will "facilitate" the sale of the practice "through a combination of marketing of available practices and by bringing prospective buyers to" Sorkin, which it indisputably did.

¶ 25        In his reply brief, Sorkin asserts that the "actual language of the Agreement" required APS to comply with his directives regarding marketing tactics, citing section 3, which provides

that APS "has an exclusive right to sell, merge, transfer and/or convey this practice. *** During the listing period Seller will not sell or attempt to sell this practice apart from APS nor will Seller engage the services of any other agent or broker." Sorkin's position is not supported by this language, which does not specify how APS shall exercise its exclusive right to market Sorkin's practice during the listing period. Thus, API did not breach the agreement by refusing Sorkin's request to obtain new LOIs from prospective buyers.

¶ 26 Sorkin additionally argues that APS materially breached the contract by terminating it. Perpetual contracts are disfavored in law, and the general presumption is that "[c]ontracts of indefinite duration are terminable at the will of either party." *Jespersen v. Minnesota Mining & Manufacturing Co.*, 183 Ill. 2d 290, 293, 295 (1998). This presumption "can be overcome by demonstrating that the parties contracted otherwise." *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 489 (1987). "An agreement without a fixed duration but which provides that it is terminable *only* for cause or upon the occurrence of a specific event is *** terminable only upon the occurrence of the specified event and not at will." (Emphasis in original.) *Jespersen*, 183 Ill. 2d at 293.

¶ 27 Section 4 of the contract provides:

"4. TERM OF AGREEMENT: This agreement shall commence on the day and year set forth below and continues for a MINIMUM period of ninety (90) days from the date of this agreement. This agreement shall automatically renew for consecutive fifteen-day periods until Seller gives APS written notice of intent to cancel."

This language does not give Sorkin the "exclusive and specific" (*id.* at 294) right to terminate the contract, since it does not state that it "is terminable *only* *** upon the occurrence of a specific

event" (emphasis in original) (*id.* at 293) and does not purport to restrict APS's right to terminate at will after the initial 90-day period has passed.

¶ 28    In *Burford v. Accounting Practice Sales, Inc.*, 786 F.3d 582, 587 (7th Cir. 2015), overruled on other grounds, 942 F.3d 384 (7th Cir. 2019), the parties' contract stated: "APS cannot terminate this agreement *unless it is violated by Burford*." (Emphasis in original.) Applying Illinois law, the Seventh Circuit held: "The plain reading of this statement *** is that APS could terminate the agreement if—but only if—Burford had breached it. *** By allowing APS to terminate only when Burford had breached, the contract made as clear as could be that APS could not terminate the contract at will." *Id.* By contrast, the agreement in the case at bar contains no language limiting APS's right to terminate the contract. Accordingly, APS did not breach the contract by terminating it and is not estopped from enforcing its terms.

¶ 29                          BBA Disclosures

¶ 30    Sorkin contends the contract is invalid and unenforceable because APS failed to provide him with a written disclosure document pursuant to section 10-30 of the BBA:

> "A business broker must provide a written disclosure document that meets the requirements set forth in subsection (b) of this Section to a client at the time or before the client signs a contract for the services of a business broker or at the time or before the business broker receives any consideration upon the contract." 815 ILCS 307/10-30(a) (West 2016).

¶ 31    Holmes attested in his second affidavit that on February 2, 2017, prior to the signing of the contract on May 11, 2017, he provided Sorkin with a BBA disclosure document. Sorkin did not deny receiving the document or present any evidence to contradict Holmes' affidavit. At oral argument on the parties' cross-motions for summary judgment, Sorkin's counsel "clarified that if

leave were granted to assert an affirmative [defense], the Defendant's factual claim would not be a denial of having been sent the disclosure, but merely a claim that he does not recall whether or not he received it." "[F]acts contained in an affidavit in support of a motion for summary judgment which are not contradicted by counteraffidavit are admitted and must be taken as true for purposes of the motion." *Purtill v. Hess*, 111 Ill. 2d 229, 241 (1986); see also *Roth v. Carlyle Real Estate Ltd. Partnership VII*, 129 Ill. App. 3d 433, 437 (1st Dist. 1984) ("Merely alleging that a genuine issue of material fact exists without presenting any statement of fact to contradict the [movant's] version, does not thereby create such an issue." (Internal quotation marks omitted.)). Thus, we take as true Holmes' uncontested attestation that he provided Sorkin with a BBA disclosure document.

¶ 32    Citing Holmes' deposition, Sorkin asserts that "APS, through Holmes, admitted that APS did not provide any disclosure as required by section 10-30; rather, the only documentation provided from APS to Sorkin was the Agreement itself and a client information packet." This misrepresents Holmes' deposition, in which he stated that after his first meeting with Sorkin, they exchanged "more than a handful of emails" in which they negotiated the terms of the agreement, and APS subsequently compiled a client information packet regarding his practice. Holmes never stated that the agreement and the client information packet were the *only* documents exchanged between the parties, and he gave no testimony regarding the BBA disclosure.

¶ 33    Sorkin additionally argues that Holmes "admi[tted] that the disclosure didn't exist" in his first affidavit, in which he requested the court permit "discovery of material facts to determine whether the exemptions to the [BBA] disclosure requirements apply." We disagree. APS seeking

discovery regarding exemptions to the BBA disclosure requirements is not the equivalent of testimony that a disclosure was not provided.

¶ 34　　　　Lastly, Sorkin asserts that a BBA disclosure must be "contemporaneously provided with the contract that was to be signed" and the disclosure sent to him in February 2017, more than four months before the contract was signed in May 2017, was invalid. The BBA states that the disclosure must be provided "at the time or before the client signs a contract for the services of a business broker" (815 ILCS 307/10-30(a) (West 2016)) and section 140.300 of the Illinois Administrative Code clarifies that it must be provided "at least seven days before" signing (14 Ill. Admin. Code § 140.300 (2022)). However, neither the statute nor the Code requires that the disclosure be provided "contemporaneously" with the contract. Accordingly, Sorkin has failed to raise an issue of material fact as to whether APS provided him with a written disclosure document pursuant to section 10-30 of the BBA.

¶ 35　　　　　　　　　　　　　　　　　Leave to Amend

¶ 36　　　　Sorkin contends that the trial court abused its discretion in denying his motion for leave to amend his affirmative defenses to assert material breach and failure to comply with the BBA. Whether to grant a motion to amend the pleadings lies within the sound discretion of the trial court. *Shutkas Electric, Inc. v. Ford Motor Co.*, 366 Ill. App. 3d 76, 82 (2006). In determining whether an abuse of discretion has occurred, we consider (1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified. *Loyola Academy v. S & S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992).

¶ 37    Here, Sorkin's proposed amendment would not cure any defects in his pleading because his affirmative defenses lack merit. APS did not materially breach the contract, and it was Holmes' uncontroverted attestation that he provided Sorkin with a BBA disclosure document prior to signing the contract. Since the proposed amendment did not cure the original complaint's defects, we need not address the remaining *Loyola Academy* factors, and the trial court did not abuse its discretion in denying Sorkin's motion to amend. See *Myers v. Illinois Central R. Co.*, 323 Ill. App. 3d 780, 788 (2001).

¶ 38                                             CONCLUSION

¶ 39    For the foregoing reasons, we affirm the judgment of the trial court. Pursuant to paragraph 10 of the contract, which allows for the recovery of fees and costs by the prevailing party, we remand to allow APS to file a petition in the trial court for fees and costs incurred in this appeal.

¶ 40    Affirmed and remanded.

¶ 41    JUSTICE HYMAN, specially concurring:

¶ 42    Intensifiers are adverbs or adjectives intended to lend force or emphasis to the meaning of a word or phrase. Common examples in legal writing include "clearly," "merely," and "very." Most exponents of good legal writing agree that intensifiers hamper rather than enhance prose, making it clunky, disconcerting, and, typically, hyperbolic.

¶ 43    Yet, counsel for the appellant and appellees liberally peppered their briefs with unnecessary and, truth-be-told, presumptuous intensifiers. A *few* examples: "clearly" (appellant's briefs 15 times and appellees' brief 10 times); "merely" (appellant's briefs 5 times and appellees' brief 7 times); "actually" (appellant's reply brief 5 times); and "certainly" (appellant's reply brief 4 times). Other intensifiers that stood out were "brazenly," "unequivocally," "utterly,"

"woefully," and "really." As a professional brief reader, I can assure you that, while overly ornamented, these briefs have plenty of company when it comes to the intensive use of intensifiers.

¶ 44    Take "clearly," the all-time brief favorite. U.S. Supreme Court Chief Justice John G. Roberts Jr. has said, "We get hundreds and hundreds of briefs, and they're all the same. "Somebody says, 'My client clearly deserves to win, the cases clearly do this, the language clearly reads this.' ***. And you pick up the other side and, lo and behold, they think they clearly deserve to win." Barnes, *Chief Justice Counsels Humility*, Wash. Post, at A15 (Feb. 6, 2007). In other words, sheathe "clearly"; it's pointless saber-rattling.

¶ 45    In my favorite book of his, *On Writing*, novelist Stephen King tried to scare away the use of adverbs, noting the "road to hell is paved with adverbs." That should be enough to curdle your intensifiers, if not your blood. See Garner, *Interviews With United States Supreme Court Justices: Justice Anthony M. Kennedy*, 13 *Scribes J. of Legal Writing* 79, 92-93 (2010) (quoting Associate Justice Anthony Kennedy, "I do not like adverbs. I noticed once that Hemingway had no adverbs, or very few, very few. And I think adverbs are a copout"); *Bennett v. State Farm Mut. Auto Ins. Co.*, 731 F.3d 584, 584-85 (6th Cir. 2013) (noting, "the near-certainty that overstatement will only push the reader away").

¶ 46    Also, consider this from lawyer Bryan A. Garner, the author or editor of more than 20 books on writing. Garner regards intensifiers as "weasel words" that "reassure the writer but not the reader. If something is clearly or obviously true, then demonstrate the fact to the reader without resorting to the conclusory use of these words." Garner, *The Redbook: A Manual on Legal Style* 224 ( 2d ed. 2006). Simply put, wait to press the submit button until those weasel words have gone pop.

¶ 47        Actually, briefs certainly benefit from not merely limiting, but clearly avoiding, the very occurrence of intensifiers.