# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-41261

United States Court of Appeals
Fifth Circuit

**FILED**

March 20, 2018

Lyle W. Cayce
Clerk

BEAR RANCH, L.L.C.,

Plaintiff - Appellant Cross-Appellee

v.

HEARTBRAND BEEF, INCORPORATED; RONALD BEEMAN; AMERICAN AKAUSHI ASSOCIATION, INCORPORATED,

Defendants - Appellees Cross-Appellants

Appeals from the United States District Court
for the Southern District of Texas

Before REAVLEY, SOUTHWICK, and HAYNES, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

This appeal arises after more than five years of litigation between Bear Ranch, a cattle ranch in Colorado, and HeartBrand Beef, a cattle ranch and beef production company in Flatonia, Texas. We AFFIRM the district court's judgment in all respects except its decision to grant punitive damages to HeartBrand. We conclude punitive damages are not justified under Texas law. We REVERSE that award.

## FACTUAL AND PROCEDURAL BACKGROUND

This appeal stems from a long-running dispute between HeartBrand Beef, Incorporated, and Bear Ranch, LLC. The subject of the contract is

No. 16-41261

Akaushi cattle, a specialty breed from Japan known for producing beef with rich flavor, tenderness, and health benefits.  Japanese laws protect Akaushi cattle as a national treasure and restrict their export, which results in a limited supply of the cattle in the United States.

In the 1990s, HeartBrand's predecessor imported 11 head of Akaushi cattle from Japan to New York and eventually to Texas.  In 2006, HeartBrand acquired its predecessor's assets and began "selling Akaushi cattle to a group of producers pursuant to contracts" known as Full-Blood and F1 Program Contracts.[1]  The purpose was to "promote the raising of Akaushi cattle and the marketing of meat from such cattle outside of Japan so that the Akaushi breed may grow in stature and number to the mutual economic benefit" of HeartBrand and the contracted producers.   The Full-Blood Contracts contained provisions governing, among other things, (1) "the sale of breeding stock;" (2) "registration with the American Akaushi Association, Inc.;" (3) "restrictions on sale of full-blood offspring;" and (4) marketing of the cattle.

In July 2010, Bear Ranch purchased 424 head of cattle and 10,000 units of Akaushi genetic material from HeartBrand (the "HeartBrand Cattle") for $2.4 million, subject to a Full-Blood Contract and an F1 Program Contract.  A provision in the Full-Blood Contract was that, "if any legal action is brought to enforce this Agreement . . . , it is expressly agreed that the prevailing party . . . shall be entitled to recover from the other party reasonable attorney's fees, expenses, and costs."  If Bear Ranch breached, HeartBrand was also entitled to injunctive relief ensuring that it obtained possession of all the cattle identified in the agreement.

Subsequently, Bear Ranch bought more Akaushi cattle from other

---

[1]  The F1 Program Contract governs the breeding program HeartBrand offers to producers such as Bear Ranch.

No. 16-41261

HeartBrand producers in a series of "handshake" transactions: (1) in December 2010, Bear Ranch purchased 50 cattle from Tony Spears; (2) in June 2011, Bear Ranch purchased approximately 500 cattle from Ronald Beeman; and (3) from July-September 2011, Bear Ranch purchased 195 cattle from Twinwood Cattle. At some point after the cattle purchases, disputes arose between HeartBrand and Bear Ranch regarding the contractual restrictions placed on the Akaushi cattle. HeartBrand claimed the Full-Blood contractual restrictions for the HeartBrand Cattle from the HeartBrand contract also applied to the later purchases of cattle from Spears, Beeman, and Twinwood.

In March 2012, Bear Ranch sued HeartBrand, Beeman, and the American Akaushi Association, Incorporated, alleging that HeartBrand violated the Sherman Antitrust Act and other laws aimed at curbing anticompetitive conduct by "engaging in unfair practices in the livestock industry." Bear Ranch sought declaratory relief to prevent HeartBrand from monopolizing the Akaushi beef product market in the United States. Alternatively, Bear Ranch sought a declaration that the Full-Blood contractual restrictions were unenforceable and that Bear Ranch was fraudulently induced into executing the contracts because HeartBrand represented "that it was the only source of full-blood Akaushi cattle in the United States," which Bear Ranch claims was knowingly false.

During pre-trial proceedings, HeartBrand moved for judgment on the pleadings, which the district court denied, and Bear Ranch moved to amend its complaint, which the district court allowed. In the amended complaint, Bear Ranch dropped its competition-law claims and instead raised breach of contract and fraudulent-inducement claims. HeartBrand and Beeman responded with two counterclaims against Bear Ranch for fraudulent inducement and three for fraud. HeartBrand alleged that Bear Ranch fraudulently induced the original purchase by falsely representing that it

3

would comply with the Full-Blood contractual restrictions. Beeman made similar allegations relating to the 2011 sale of the Beeman Cattle. HeartBrand and Beeman both sought rescission of their respective sales to Bear Ranch. As to its common-law fraud claim, HeartBrand argued "that Bear Ranch had represented that it only intended to produce beef for personal use and that it would comply with the 2010 contractual obligations." HeartBrand claimed this was a knowingly "empty promise[]" because Bear Ranch's alleged intent was to become its rival and avoid complying with the contractual restrictions.

After the parties filed cross-motions for summary judgment, the district court held that the Full-Blood contractual restrictions for the 2010 HeartBrand Cattle purchase did not extend, with certain irrelevant exceptions, to the cattle Bear Ranch subsequently purchased from Spears, Beeman, and Twinwood. The court also determined that "any oral agreement to apply the Full-Blood Contract restrictions would be barred by the statute of frauds[.]" This ruling resulted in the dismissal of Beeman's fraudulent-inducement claim. The court also dismissed HeartBrand's and Beeman's claim for rescission of the Bear Ranch purchases.

The district court determined that the partial summary judgment it granted "changed the complexion of the case." The cattle Bear Ranch had purchased from Spears, Beeman, and Twinwood "were suddenly legally unrestricted." According to HeartBrand, this ruling allowed Bear Ranch to act as its direct competitor in the Akaushi market and "undermin[ed] HeartBrand's investment in a uniquely refined and documented breeding nucleus." In its ruling, the court did permit HeartBrand's fraud-based counterclaims, among others, to proceed to trial. Cognizant of the "major shift in the landscape of the case," the district court granted a continuance, which allowed HeartBrand time to submit a revised expert report from Jeffrey S. Andrien, its valuation expert, that would "value the equitable remedy of unjust

No. 16-41261

enrichment on its fraud claims[.]" In his supplemental report, Andrien opined that Bear Ranch's unjust enrichment from the unrestricted cattle would be $89.8 million — $76.7 million of which was associated with the Beeman Cattle.

After taking Andrien's deposition, Bear Ranch objected to his report and sought to exclude his testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Bear Ranch argued that admitting Andrien's opinion and testimony would risk "inflaming jury passions" and "the sudden transformation of what has been around a $1 million case . . . into a $90 million case will only confuse the jury and . . . unfairly prejudice Bear Ranch[.]" The court ultimately permitted Andrien's testimony at trial and allowed Bear Ranch to put on four rebuttal witnesses, including its own valuation expert.

The trial began on May 16, 2014. On May 29, the jury found for HeartBrand on two counterclaims: (1) fraud regarding the 2011 sale of the Beeman Cattle; and (2) breach of the 2010 Full-Blood and F1 Program Contracts governing the HeartBrand Cattle purchase. The advisory jury found that Bear Ranch was unjustly enriched by $23,199,000 because of its fraudulent behavior in the Beeman Cattle purchase. The jury also assessed against Bear Ranch $1,825,000 in exemplary damages on the Beeman Cattle fraud claim.

After denying multiple post-trial motions, the district court entered an Amended Final Judgment on August 11, 2016. Relevant to this appeal, the court ordered the following: (1) Bear Ranch would take nothing in its suit against the defendants; (2) the provisions of the 2010 contract with HeartBrand did not apply to the Beeman, Spears, or Twinwood Cattle; (3) Bear Ranch was liable for fraudulent inducement committed against HeartBrand based on the 2011 Beeman Cattle purchase; (4) Bear Ranch would hold the Beeman Cattle in a constructive trust for HeartBrand; (4) Bear Ranch would

No. 16-41261

pay $1,825,000 in exemplary damages to HeartBrand; (5) Bear Ranch was liable for breach of contract from the original HeartBrand Cattle purchase; (6) Bear Ranch was ordered to comply with a multi-faceted permanent injunction on the Twinwood/Spears Cattle; and (7) Bear Ranch would pay HeartBrand $3.2 million in attorney's fees. Bear Ranch timely appealed, and HeartBrand cross-appealed.

## DISCUSSION

We will address the issues in the following order. Bear Ranch contests the jury's finding of fraud on the Beeman Cattle contract, the court's decision to admit the expert Andrien's testimony, the injunction requiring Bear Ranch to abide by the HeartBrand contract restrictions on the Twinwood and Spears cattle, the court's decision to grant $3.2 million in attorney's fees to HeartBrand as the prevailing party, and the grant of exemplary damages. HeartBrand cross-appeals that the monetary threshold for the constructive trust on the Beeman Cattle was too high. It also argues we should remand for a new trial if the fraud verdict is vacated.

I.    *Sufficiency of evidence for jury's fraud verdict*

We review *de novo* the denial of a motion for judgment as a matter of law, with our review being particularly deferential to a jury verdict. *SMI Owen Steel Co. v. Marsh USA, Inc.*, 520 F.3d 432, 437 (5th Cir. 2008). We will affirm a jury verdict unless the jury lacked "a legally sufficient evidentiary basis to find for" the prevailing party. FED R. CIV. P. 50(a). The record and all of the evidence is reviewed "in the light most favorable to the non-movant." *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1323 (5th Cir. 1994). Under Texas law, the elements for fraud are: (1) a material representation; (2) that was false; (3) with a knowing or reckless disregard for the truth; (4) intent that the other

No. 16-41261

party act upon the misrepresentation; (5) action in reliance on the representation; and (6) damages. *See In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001).

The jury found that Bear Ranch committed fraud by misrepresenting "that it intended to sell to HeartBrand 30% of its calves and that it would comply with the restrictions in the 2010" Full-Blood Contracts for the Beeman Cattle. In denying Bear Ranch's motion for judgment as a matter of law, the district court stated, "there's clearly sufficient evidence to find" that "Calles actually assented to Fielding's comment that the full-blood contract" applied to the Beeman cattle. The district court also held that "Mr. Gill's comment was also an actionable misrepresentation."[2] The court found that Gill was in Texas negotiating the Beeman contract, and there was testimony that Gill agreed to the same terms as the HeartBrand Cattle contract. Alternatively, the district court found that Bear Reach misrepresented its intent to sell 30% of its calves back to HeartBrand. As the district court stated, "the 30 percent sell back is just a far more specific statement to support a misrepresentation finding than things like promises to, quote, receive business which have been found to be insufficient in the cases Bear Ranch cites[.]"

Given our standard of review, we agree with the district court's holding that sufficient evidence supported the jury's verdict finding that Bear Ranch committed fraud by misrepresenting its intention to sell HeartBrand 30% of its calves and that it would "comply with the restrictions in the 2010" Full-Blood Contracts for the Beeman Cattle. Texas courts have upheld fraud claims based on representation with less specificity than the ones made by Bear Ranch. *See Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 214–15 (Tex.

---

[2] Bill Fielding is HeartBrand's CEO. Antonio Calles was a contractor that provided breeding services for Bear Ranch. Rob Gill worked as a manager for Bear Ranch.

No. 16-41261

App.—Houston [14th Dist.] 2001, pet. denied); *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 614 (Tex. App.—Waco 2000, pet. denied).

As to whether HeartBrand suffered an injury, we have previously determined a plaintiff was injured when it entered into a commercial transaction based on misrepresentations by the defendants on which the plaintiff relied. *Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n*, 885 F.2d 266, 273 (5th Cir. 1989). "Under Texas law, lost profits are a cognizable injury." *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 275 (5th Cir. 2012).

Here, HeartBrand gave up a commercial opportunity to purchase the Beeman Cattle for which it would have realized profits under its closed-business model for Akaushi Cattle. At trial, Bill Fielding, HeartBrand's CEO, testified that without calf deliveries from Beeman — who typically sold 40%-50% of his calves to the company — HeartBrand would lose a dependable supply of calves for which it had a track record of making substantial profit margins over the prior four to five years. Thus, sufficient evidence existed for the jury to find that HeartBrand suffered a cognizable injury from Bear Ranch's misrepresentation. As we are affirming on this issue, we do not reach HeartBrand's conditional cross-appeal.

## II.     *Admitting Andrien's expert testimony*

We review the admissibility of expert testimony for abuse of discretion. *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 324–25 (5th Cir. 2004). A trial court has broad discretion to admit expert opinion evidence, and we will affirm unless the admission of expert opinion evidence was manifestly erroneous. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "'Manifest error' is one that is 'plain and indisputable, and that amounts to a complete disregard of the controlling law.'" *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 775 (5th Cir. 2017) (quoting *Guy*, 394 F.3d at 325). If we determine the trial court

8

abused its discretion, then we "review the error under the harmless error doctrine, affirming the judgment, unless the ruling affected substantial rights of the complaining party." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003).

The *Daubert* gatekeeping function "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert*, 509 U.S. at 589). This obligation requires a district court to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 592–93); *see also* FED. R. EVID. 702.

After Andrien testified, the district court noted that Bear Ranch's lead counsel "was able to conduct a skillful cross-examination despite" Bear Ranch's concern about its limited time to prepare for Andrien's new valuation testimony. Bear Ranch also put on four rebuttal witnesses, three who specifically testified on the damages issues, including Bear Ranch's own valuation expert, Scott Bayley. *Daubert* recognizes that a "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596.

Bear Ranch's objection to this expert opinion evidence is more of a disagreement about the reasonableness of Andrien's valuation than the rigor of the district court's preliminary assessment. The record indicates that Andrien's valuation opinions were not so unreliable as to warrant exclusion under *Daubert* and Federal Rule of Evidence 702. Furthermore, any error the court made in admitting Andrien's testimony, which is not an error that could

be described as "plain and indisputable," is tempered by the fact that the jury's damages award was merely advisory to the court. *See Guy*, 394 F.3d at 325. Thus, we conclude that the district court did not abuse its discretion when it exercised its "wide latitude in determining the admissibility" of Andrien's testimony. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997).

### III.    *Modifying injunction relating to the Twinwood/Spears cattle*

A district court's decision to modify an injunction is reviewed for abuse of discretion. *ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 445 F.3d 841, 850 (5th Cir. 2006). "Modification of an injunction is appropriate when the legal or factual circumstances justifying the injunction have changed." *Id.* The party seeking to modify the injunction has the burden to show "that changed circumstances warrant relief[.]" *Horne v. Flores*, 557 U.S. 433, 447 (2009).

In February 2016, the district court entered an injunction that required Bear Ranch to comply with the restrictions imposed in the 2010 HeartBrand contract. On appeal, Bear Ranch argues that the rationale for this injunction no longer applies and should be vacated. When requiring Bear Ranch to abide permanently by any restrictions included in the 2010 Full-Blood and F1 Program Contracts, the district court found that "unrestricted sales" of the Twinwood/Spears Cattle would "undermine the integrity of HeartBrand's Akaushi program, caus[e] irreparable injury to HeartBrand, and would also result in" Bear Ranch's unjust enrichment. As the district court correctly determined when denying Bear Ranch's Rule 59(e) motion, even if HeartBrand "abandoned" its closed-business model with regard to one producer, that does not vitiate the harm it suffered through Bear Ranch's fraudulent actions.

The district court did not abuse its discretion when it chose not to modify the injunction in April 2016 as there is no showing of a significant change in circumstances. *ICEE*, 445 F.3d at 850. We also are not persuaded that a

change occurred between that ruling and when the district court entered its Amended Final Judgment on August 11, 2016.

### IV.     *The award of $3.2 million to HeartBrand in attorney's fees*

We review an award of attorney's fees for abuse of discretion; findings of fact supporting the award are reviewed for clear error. *Mathis v. Exxon Corp.*, 302 F.3d 448, 461–62 (5th Cir. 2002). As it supplied the rule of decision, Texas law "controls both the award of and the reasonableness of fees awarded[.]" *Id.* at 461. Texas law instructs the factfinder, judge or jury, to consider eight factors when determining the reasonableness of a fee award, including "the amount involved and the results obtained[.]" *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (citation omitted). The most important factor "is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). An award is not excessive simply because it is disproportionate to the results obtained. *Northwinds Abatement, Inc. v. Emp'rs Ins. of Wausau*, 258 F.3d 345, 355 (5th Cir. 2001).

Initially, HeartBrand requested approximately $5 million in attorney's fees, expenses, and costs. Before considering the motion, the district court ordered HeartBrand to submit a revised fee request eliminating any fees for "work on the nonrecoverable fraud claims." In a thorough opinion, the district court then observed that HeartBrand began this case on the defensive and "successfully establish[ed] the enforceability of its contractual restrictions," which was the primary focus for both sides throughout the case. The district court did not abuse its discretion in awarding $3.2 million in attorney's fees.

### V.     *Exemplary damages*

The district court also ordered Bear Ranch to pay $1,825,000 in exemplary damages to HeartBrand. The decision to grant exemplary damages

No. 16-41261

is a question of law that we review *de novo*.  *See Wal-Mart Stores, Inc. v. McKenzie*, 997 S.W.2d 278, 280 (Tex. 1999).  This case arises under diversity jurisdiction with Texas law supplying the rule of decision on exemplary or punitive damages.  In the absence of controlling precedent, we must make an *Erie* guess about whether the Texas Supreme Court would award punitive damages on these facts.  Our effort is an "attempt to predict state law, not to create or modify it."  *United Parcel Serv., Inc. v. Weben Indus., Inc.*, 794 F.2d 1005, 1008 (5th Cir. 1986).

Under Texas law, punitive damages are not available without proof of actual damages: "The mere availability of a tort-based theory of recovery is not sufficient; actual damages sustained from a tort must be proven before punitive damages are available." *Twin City Fire Ins. Co. v. Davis*, 904 S.W.2d 663, 665 (Tex. 1995).

As the relief granted consisted of a constructive trust and equitable relief, we must consider whether or to what extent equitable relief can satisfy the requirements for obtaining punitive damages in Texas.  In 1985, the Texas Supreme Court observed that it followed the minority rule in allowing exemplary damages following equitable relief and then stated in *dicta* that the return of property can "serve as a basis for the recovery of exemplary damages." *Nabours v. Longview Sav. & Loan Ass'n*, 700 S.W.2d 901, 904 (Tex. 1985) (quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 583 (Tex. 1963)).  The *Nabours* court held, however, that an award of punitive damages was not justified on the facts before it because the plaintiff did not prove any actual damages.  *Id.* at 905.

In 1987, the Texas legislature changed the requirements for obtaining exemplary damages when it passed a statute, the current version of which provides that "exemplary damages may be awarded only if damages other than nominal damages are awarded."  TEX. CIV. PRAC. & REM. CODE § 41.004(a)

12

No. 16-41261

(2003). The legislature clearly provided that "the provisions of this chapter prevail over all other law to the extent of any conflict." § 41.002(c).

The briefing directs us to caselaw containing different interpretations of possible changes in Texas law resulting from this legislation. Ultimately, the details of the differences do not affect this case. The law remains that the party seeking punitive damages must first prove actual damages. A 2016 decision paraphrased Chapter 41 and said it "precludes an award of exemplary damages unless other damages, besides nominal damages, are awarded." *Wal-Mart Stores, Inc. v. Forte*, 497 S.W.3d 460, 466 (Tex. 2016), *reh'g denied*, (Sept. 23, 2016). Therefore, Texas law requires, at the very least, that HeartBrand must show actual damages even if only nonmonetary relief is awarded.

The important point for us is that the proof necessary to show actual damages requires more than presumed harm. In *Nabours*, despite stating that equitable relief such as the return of property can justify punitive damages, the Texas Supreme Court ultimately held that punitive damages were not justified because an injunction prevented the forced sale of Nabours' home and only "presumed harm" could be shown. 700 S.W.2d at 903. Presumed harm is not sufficient to show actual damages. *Id.*

Here, the district court's equitable remedy protected HeartBrand from actual harm. HeartBrand's harm is limited to presumed harm, and that is insufficient under Texas law to justify an award of punitive damages. As the district court wrote, "the surefire way to prevent Bear Ranch from being unjustly enriched as a result of obtaining the unrestricted use of the cattle under false pretenses is to keep that unjust enrichment from happening in the first place." The district court also wrote that because "Bear Ranch has not yet realized any of the gains from its theoretical unjust enrichment," this case "presents a sharp contrast with the classic cases of unjust enrichment." On this record, HeartBrand has only shown presumed harm, which prevents an

award of punitive damages.  Therefore, we need not decide whether equitable relief could ever support punitive damages under Texas law; we simply decide that under these facts and this remedy, punitive damages are unavailable.

We reverse the district court's award of $1,825,000 in exemplary damages to HeartBrand.

## VI.    *Price set for each head of Beeman cattle*

A district court's grant of equitable relief on a disgorgement order is reviewed for abuse of discretion.  *SEC v. AMX, Int'l, Inc.*, 7 F.3d 71, 73 (5th Cir. 1993).  Discretion is abused if the district court "misapplies the law or bases its decision upon erroneous findings of fact."  *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 859 (5th Cir. 2010).  We review legal conclusions *de novo* and factual findings for clear error.  *SEC v. Gann*, 565 F.3d 932, 936 (5th Cir. 2009).

In exercising its broad discretion, a district court is not required to make a precise calculation of the amount of ill-gotten profits. *See SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993).  Instead, a district court must make a "reasonable approximation of profits causally connected to the violation." *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 413 (5th Cir. 2007) (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989)). After all, "flexibility [is] inherent in equitable remedies[.]" *Kansas v. Nebraska*, 135 S. Ct. 1042, 1058 (2015) (quoting *Brown v. Plata*, 563 U.S. 493, 538 (2011)).

Here, the district court's factual findings do not amount to clear error. They were "plausible in light of the record viewed as a whole[.]"[3]  *Bertucci*

---

[3] The advisory jury found "that Bear Ranch was unjustly enriched by $23,199,000[.]" The district court found Bear Ranch had not yet realized any of the gains, however, which "present[ed] a sharp contrast from the classic cases of unjust enrichment."  The district court then crafted an equitable remedy and constructive trust designed to prevent HeartBrand from being injured.  Under this remedy, Bear Ranch would hold the cattle in trust for HeartBrand, who would have an equitable claim on the cattle.  If HeartBrand claimed the cattle from the 2010 sale, it had to reimburse Bear Ranch for the acquisition, production, and

No. 16-41261

*Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 258 (5th Cir. 2006). HeartBrand's legal challenge to the Constructive Trust Threshold fares no better. In arguing that the district court is enabling unjust enrichment rather than preventing it, HeartBrand misinterprets the purpose of the law of disgorgement under which "a disgorgement order might be for an amount more or less than that required to make the victims whole." *Huffman*, 996 F.2d at 802. The district court did not abuse its discretion when it set the Constructive Trust Threshold at $3,796 per head.

AFFIRMED in part and REVERSED in part.

---

maintenance costs. To claim any offspring of the 2010 cattle born since the trial, HeartBrand would have to pay $3,898 per head of cattle along with reasonable maintenance costs.