## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 3, 2020

Lyle W. Cayce
Clerk

No. 18-11416

BNSF RAILWAY COMPANY,

      Plaintiff – Appellee

v.

PANHANDLE NORTHERN RAILROAD, L.L.C.,

      Defendant – Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before DAVIS, GRAVES, and HIGGINSON, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

In this contract dispute between two railroad companies, Defendant, Panhandle Northern Railroad, L.L.C. ("PNR"), appeals the district court's judgment in favor of Plaintiff, BNSF Railway Company ("BNSF"). PNR asserts that, contrary to the district court's determination, the handling-carrier relationship established by the 1993 Agreement between the parties was terminable at will under Illinois law. PNR argues that the district court

No. 18-11416

consequently erred in ruling that PNR breached the Agreement when it terminated unilaterally the handling-carrier relationship effective January 1, 2017, after reasonable notice to BNSF. PNR further argues that the district court erred in dismissing its affirmative defense of BNSF's prior material breach, in requiring PNR to identify an express contractual provision in order to assert the defense of justification, and in awarding BNSF exemplary damages and specific performance.

We conclude that the first issue raised by PNR is determinative of this appeal. Specifically, we hold that the handling-carrier relationship established by the 1993 Agreement between the parties is terminable at will under Illinois law and that PNR consequently had a right to terminate the relationship unilaterally upon reasonable notice to BNSF. Therefore, we REVERSE the district court's judgment and RENDER judgment in favor of PNR.

## I. Factual Background

In October 1993, the predecessor companies[1] of BNSF and PNR executed a contract entitled: Agreement for Sale of Certain Assets, Rights and Obligations of the Atchison, Topeka and Santa Fe Railway Company to Panhandle Northern Railroad Company ("1993 Agreement"). The 1993 Agreement concerned one of BNSF's rail branch lines—the Borger Line. As illustrated below, the Borger Line stretches approximately 31 miles from Borger, Texas to Panhandle, Texas. At Panhandle, the Borger Line connects to BNSF's Southern Transcon line, a main line running from Chicago to Los Angeles.

---

[1] In 1994, Panhandle Northern Railroad Company changed from a corporation to a limited liability company, PNR. In 1995, the Atchison, Topeka, and Santa Fe Railway merged with Burlington Northern Railroad to form BNSF. Throughout this opinion, we use the contracting parties' present-day names.



As explained by BNSF, it built the Borger Line to serve petrochemical refineries constructed in Borger in the 1920s. In the early 1990s, however, seeking "to conserve capital, protect customer relationships, and increase efficiency," BNSF sold certain branch lines and abandoned others. Although it apparently did not make economic sense to BNSF to operate the Borger Line, BNSF did not believe it could obtain the necessary federal regulatory approval to abandon the line. Therefore, BNSF sold the Borger Line and, consistent with BNSF policy when selling branch lines, contracted with the purchasing railroad, PNR, to serve as BNSF's "handling carrier." As explained in further detail below, a handling-carrier arrangement allowed BNSF to set the routes and rates for freight customers requiring service on BNSF's rail line and PNR's rail line (the newly-acquired Borger Line), and to bill and collect revenue from those interline rail service customers, as though the Borger Line were still part of the BNSF rail system after the sale. PNR, as the new owner and operator of the Borger Line, moved ("handled") the freight on the Borger Line and was

No. 18-11416

paid a flat fee per rail car by BNSF out of the revenue BNSF received from freight customers for the interline rail service provided by both companies.[2]

In the 1993 Agreement, BNSF agreed to sell the Borger Line and associated rail business to PNR by November 1993. Specifically, in the first section of the Agreement, BNSF agreed to sell to PNR: (1) the Borger Line and all of the real estate and improvements associated with the line, (2) the rail freight transportation business it conducts on the line (or "Rail Business"), and (3) all of the tangible personal property it used in connection with its Rail Business and located on the line. The Agreement provided that the Rail Business included BNSF's rights "to operate freight trains over the Borger Line, to establish freight rates over the Borger Line, to enter into freight transportation contracts for rail freight operations over the Borger Line, and to interchange rail freight traffic to and from the Borger Line with [BNSF]." BNSF also agreed to assign to PNR all of its rights and obligations under various contracts "relating to the Borger Line and the Rail Business to the extent necessary for PNR to conduct the Rail Business as presently conducted." To complete these transactions, the Agreement required BNSF to deliver a quitclaim deed and bill of sale to PNR, as well as execute an assignment in favor of PNR, upon "Closing." The Agreement set a purchase price of $995,000 "[f]or the rights and interests conveyed and assigned by [BNSF] to PNR," which was to be paid at Closing.

On November 3, 1993, BNSF sold the Borger Line to PNR by executing a quitclaim deed to PNR, conveying all of BNSF's "right, title and interest . . . in and to the lands and premises" described as the Borger Line. On November 15, 1993, BNSF also executed an assignment in favor of PNR, in

---

[2] As described by PNR in its letter to rail customers, freight service provided by BNSF and PNR, in effect, was "bundled" such that customers received a single freight bill from BNSF for interline service provided by both PNR and BNSF.

which BNSF assigned its rights in various contracts to PNR "related to the Borger Line and the Rail Business to the extent necessary for PNR to conduct the Rail Business as presently conducted."

The second section of the 1993 Agreement detailed the transition of the Borger Line from being operated by BNSF to being operated by PNR following the Closing.  The Agreement provided that at 12:01 A.M. on the day following the Closing Date, "[a]ll rail operations on the Borger Line and the Rail Business shall be transferred from [BNSF] to PNR."  This section also confirmed that, as owner and operator of the Borger Line, "PNR shall be responsible for all common carrier rail operations on the Borger Line."[3]

The third section of the Agreement, entitled "Operations Following the Closing Date," lies at the heart of the dispute between the parties.  This section of the Agreement created the handling-carrier relationship between PNR and BNSF that would take effect after completion of the sale of the Borger Line to PNR.  As stated above, this arrangement allowed BNSF to set routes and rates, and bill and collect revenue from customers, as though the Borger Line were still part of the BNSF rail system.  BNSF moved freight on its line, and PNR moved freight on the Borger Line, but for those customers requiring interline service (i.e., service over both BNSF and PNR rail lines), BNSF billed the customers for the services rendered by both railroads.  Specifically, the 1993 Agreement provided that "[u]ntil such time as PNR and [BNSF] otherwise mutually agree," BNSF "shall have the authority to establish through rail routes ('Through Routes'), and to offer through rail freight rates via the Through Routes ('Through Rates'), for interline rail freight transportation

---

[3] Under federal common-carrier law, "[a] rail carrier providing transportation or service . . . shall provide the transportation or service on reasonable request."  49 U.S.C. § 1101(a).  Thus, as the common carrier of the Borger Line, PNR is required to move freight for any rail customer upon reasonable request.  PNR is also required to "provide to any person, on request, [its] rates and other service terms."  49 U.S.C. § 1101(b).

service offered by PNR and [BNSF]." The parties further agreed that the revenue BNSF received from customers paying for such interline rail service would be divided between them and that BNSF would remit a negotiated flat fee per rail car to PNR out of that revenue for its rail service.

From the perspective of a BNSF interline customer requiring service on the Borger Line, BNSF's service with respect to the setting of rates and the billing for services rendered was the same prior to and after the sale of the Borger Line to PNR. The customer continued to receive just one bill from BNSF, rather than two from BNSF for rail service on its rail line and PNR for rail service on its newly-acquired Borger Line.[4] BNSF presumably benefitted from this arrangement as it continued to bill customers and collect revenue as though it still owned the Borger Line. PNR, which was a startup operation, also presumably benefitted in that it did not have to establish customer relationships or take on the administrative tasks of billing and collecting the revenue for the rail service it rendered on the Borger Line.

The last section of the 1993 Agreement stated that "[t]he representations, warranties, and obligations of PNR and [BNSF] in this Agreement are continuing and survive Closing." Additionally, the Agreement provided that the "[t]erms of continuing obligations in this Agreement are subject to amendment only by a written contract signed by both PNR and [BNSF], or their respective successors or assignees." The Agreement further stated that it "shall be governed by and construed in accordance with the laws of the State of Illinois."

Between 1994 and 2016, the parties amended the 1993 Agreement eight times, primarily to reflect increases in the per-car fee BNSF was required to

---

[4] In that way, BNSF and PNR rail services were bundled in one bill to a freight customer needing what had become "interline" service, i.e., service on both the BNSF mainline and service on the PNR Borger Line.

remit to PNR, but the basic handling-carrier relationship described above remained in place for approximately twenty-three years.  In September 2016, PNR advised BNSF of its intention to terminate the handling-carrier relationship effective January 1, 2017, and to begin setting rates on its Borger Line and billing and collecting directly from customers for the freight transportation services it renders on the line.  PNR asserted that it could terminate the handling-carrier relationship because under Illinois law, which specifically applied to the Agreement, "perpetual agreements are terminable by either party on reasonable notice."  BNSF, however, disagreed that the handling-carrier arrangement between the parties could be terminated unilaterally and filed suit against PNR.

## II.  Procedural History

In October 2016, BNSF filed a petition for declaratory relief and damages, an application for a temporary restraining order ("TRO"), and a request for injunctive relief against PNR in Texas state court.  BNSF asserted that PNR had no right, contractual or otherwise, to terminate the handling-carrier relationship created by the 1993 Agreement.  BNSF further maintained that it was entitled to damages based on PNR's anticipatory breach of the Agreement and PNR's breach of its duty of good faith and fair dealing.  BNSF additionally contended that PNR threatened to interfere with BNSF's relationships with its customers by separately setting rates and billing BNSF's customers for freight transportation services.

PNR removed the action to federal district court on the basis of diversity jurisdiction.  BNSF thereafter filed an amended complaint in which it added an alternative claim for rescission of the Agreement.  Specifically, if the district court determined that the handling-carrier relationship between the parties was terminable at will, then BNSF requested the district court to use "its equitable powers to rescind and/or unwind" the sale of the Borger Line "subject

to the approval of the Surface Transportation Board." BNSF also filed an application for a TRO and preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure. The district court denied BNSF's application, concluding that BNSF had not carried its burden of establishing a substantial threat of irreparable injury.

In response to BNSF's amended complaint, PNR filed a motion to dismiss under Rule 12(b)(6). PNR contended that BNSF's claims failed because the handling-carrier relationship was of indefinite duration and, therefore, terminable at will under Illinois law. The district court denied the motion. PNR subsequently answered BNSF's amended complaint, raising numerous affirmative defenses. In the event the court determined that the Agreement should be rescinded, PNR also asserted a counterclaim against BNSF for quantum meruit for the reasonable value of the services PNR rendered BNSF and for PNR's maintenance and improvement of the Borger Line, less any amounts BNSF previously paid for the services.

BNSF filed a motion for partial summary judgment, arguing, inter alia, that the "terminable at will" doctrine was inapplicable to PNR's obligation to act as BNSF's handling carrier. PNR also filed a motion for summary judgment, reasserting the arguments raised in its Rule 12(b)(6) motion. The district court granted BNSF's motion for partial summary judgment and denied PNR's summary judgment motion. Pertinent to the issues on appeal, the district court determined that, as a matter of law, the Agreement was not terminable at will. Consequently, the district court concluded that PNR breached the Agreement when it unilaterally terminated the Agreement.

The district court subsequently tried, before a jury, the issue of the amount of damages BNSF was entitled to as a result of PNR's contractual breach and BNSF's claim against PNR for tortious interference with its customer contracts. Based on the jury's verdict, the district court ultimately

entered a final judgment awarding BNSF $900,000 for past contract injury and $795,991 for past tortious interference, both amounts "to be construed as an equitable recovery." The district court also awarded BNSF $1,591,982 in exemplary damages and ordered PNR's specific performance "of its obligations under Section III of the Agreement to act as BNSF's handling carrier." PNR filed a timely notice of appeal. It also filed a motion to stay execution of the judgment, which the district court granted. The district court also ordered PNR to post a supersedeas bond in the amount of $5,815,083.38 for the duration of the pendency of PNR's appeal.

### III. Discussion

As stated above, the district court granted partial summary judgment in favor of BNSF and determined, as a matter of law, that the handling-carrier relationship between the parties was not terminable at will and that PNR was not entitled to terminate it unilaterally. This court reviews a district court's grant of summary judgment de novo.[5] Under Rule 56 of the Federal Rules of Civil Procedure, "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6]

Because this case arises under our diversity jurisdiction, the *Erie* doctrine requires that we apply the applicable state substantive law.[7] It is undisputed that Illinois law governs interpretation of the 1993 Agreement.[8] In determining Illinois law, "we look first to the final decisions of . . . the [Illinois] Supreme Court."[9] "In the absence of a determinative decision by that court on

---

[5] *Apache Corp. v. W & T Offshore, Inc.*, 626 F.3d 789, 793 (5th Cir. 2010).

[6] FED. R. CIV. P. 56(a).

[7] *See Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

[8] Section IV(6) of the Agreement states that it "shall be governed by and construed in accordance with the laws of the State of Illinois."

[9] *ExxonMobil Corp. v. Elec. Reliability Serv., Inc.*, 868 F.3d 408, 414 (5th Cir. 2017).

the issue of law before us, we must determine, in our best judgement, how we believe that court would resolve the issue."[10]   An *Erie* guess must be an "attempt to predict state law, not to create or modify it."[11]

## A.  The Illinois Supreme Court's *Jespersen* Decision

As acknowledged by the parties and the district court, *Jespersen v. Minnesota Mining and Manufacturing Company*[12] is the authoritative decision from the Illinois Supreme Court regarding the rules applicable to contracts of indefinite duration under Illinois law.  In *Jespersen*, the court acknowledged that "[i]t has long been recognized that contracts of indefinite duration are generally terminable at the will of the parties."[13]  A close look at the court's analysis of the contract involved in *Jespersen* shows that this general rule of at-will termination is strong and that the Illinois Supreme Court requires specific and unequivocal language to find the rule inapplicable to a contract of indefinite duration.

In *Jespersen*, a distributor sued a manufacturer for breach of contract after the manufacturer terminated a sales distribution agreement with the distributor after thirteen years.[14]  The contract provided "that it 'shall continue in force indefinitely' unless terminated in the manner provided in article IV."[15]  Under article IV, there were two termination provisions: one applicable to the manufacturer and the other applicable to the distributor.  The provision applicable to the manufacturer stated that the manufacturer "may, upon not less than thirty (30) days notice to the Distributor, terminate this agreement

---

[10] *Id.*

[11] *Bear Ranch, L.L.C. v. Heartbrand Beef, Inc.*, 885 F.3d 794, 804 (5th Cir. 2018) (citing *United Parcel Serv., Inc. v. Weben Indus., Inc.*, 794 F.2d 1005, 1008 (5th Cir. 1986)).

[12] 700 N.E.2d 1014 (Ill. 1998).

[13] *Id.* at 1015 (citation omitted).

[14] *Id.*

[15] *Id.*

for any of the following reasons." All of the listed reasons constituted "instances of material breach."[16] The termination provision applicable to the distributor provided that "Distributor may terminate this agreement upon thirty (30) days written notice to [the manufacturer]."[17]

The court determined that although the termination provision applicable to the manufacturer allowed termination for instances of material breach, the provision was "not sufficient to take th[e] agreement of indefinite duration out of the general rule of at-will termination for two reasons."[18] First, the language of the termination provision was "permissive and equivocal; a party 'may' terminate for the stated grounds—the clear inference being that those grounds are not the sole or exclusive basis for termination."[19] Second, the court noted that "the termination events are themselves instances of material breach, and *any* contract is terminable upon the occurrence of a material breach."[20] The court concluded that none of the termination provisions took the contract of indefinite duration out of the at-will rule.

The court explained that its rationale for interpreting the contract as terminable at will reflected two important public policies. First, "in general, individuals should be free to order their affairs subject to important qualifications for instances of fraud, duress, or undue influence."[21] Second, the

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.* The court noted that the provision was "in stark contrast to a case in which the parties included an exclusive and specific right to terminate for cause in a contract otherwise of indefinite duration." *Id.* (citing *Lichnovsky v. Ziebart Int. Corp.*, 324 N.W.2d 732, 737 (1982)).

[20] *Id.* (citing *Trient Partners I Ltd. v. Blockbuster Enter. Corp.*, 83 F.3d 704, 709 (5th Cir. 1996)).

[21] *Id.*

court noted that "perpetual contracts are disfavored" because "'[f]orever' is a long time and few commercial concerns remain viable for even a decade."[22]

The manufacturer and distributor in *Jespersen* "enjoyed a long and presumably profitable relationship of thirteen or more years."[23]   The court noted that they expressly drafted a contract that was to last "indefinitely," which the courts of Illinois "have always construed to mean terminable at will."[24]   The court held that both parties enjoyed the right to terminate the agreement between them at will, "which mean[t] they could terminate the agreement for any reason or no reason without committing a breach of contract."[25]   Consequently, the court ruled in the manufacturer's favor and determined that it had not breached the contract by terminating it at will.[26]

## B.  Application of *Jespersen*

It is undisputed that there is no durational term for the handling-carrier relationship established by the 1993 Agreement between PNR and BNSF. Moreover, like the contract in *Jespersen,* the contract contains language that the parties intended the handling-carrier arrangement to be of indefinite duration.  Specifically, the Agreement provides that "[t]he representations, warranties, and obligations of [the parties] in this Agreement are continuing and survive Closing."   *Jespersen* makes clear that the handling-carrier arrangement is thus terminable at will unless there is a termination provision "sufficient to take [the] agreement of indefinite duration out of the general rule of at-will termination."[27]

---

[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.* at 1016.

No. 18-11416

Review of the 1993 Agreement reveals that there is no provision addressing termination of the handling-carrier relationship between PNR and BNSF. As noted by the parties and the district court, the Agreement provides that the terms of the handling-carrier relationship apply "[u]ntil such time as [the parties] otherwise mutually agree." BNSF argues that this provision is sufficient to take the Agreement out of the general rule of at-will termination. It asserts that this provision shows that the parties intended their handling-carrier relationship to be terminable only by mutual agreement.[28]

We disagree. As stated above, the *Erie* doctrine instructs us to look first to the final decisions of the Illinois Supreme Court and, in the absence of a determinative decision by that court, to determine in our best judgement how we believe that court would resolve the issue. The contract of indefinite duration in *Jespersen* contained more specific language regarding termination than the contract at issue here, yet the Illinois Supreme Court held that the language was not sufficient to prevent application of the general at-will termination rule. The *Jespersen* contract listed specific grounds for termination, but because those grounds were themselves instances of material breach for which any contract would be terminable, and because the contract stated the manufacturer "may" terminate for those reasons, the court held that the general rule of at-will termination applied.[29] In this matter, the phrase "[u]ntil such time as [the parties] otherwise mutually agree" does not even

---

[28] BNSF also asserts that the provision stating that "[t]erms of continuing obligations . . . are subject to amendment only by a written contract signed by both [parties]" further requires termination only by mutual written agreement. The district court also relied on this provision in determining that the handling-carrier relationship was not terminable at will. We, however, find this provision inapplicable to termination, as an "amendment" to terms is different from "termination" of those terms. *See* MERRIAM-WEBSTER'S NEW DICTIONARY (11th ed. 2016) (defining "amend" as "to change or modify (something) for the better" and "terminate" as "to bring to an end").

[29] 700 N.E.2d at 1016–17.

reference "termination," much less indicate a sole or exclusive basis for termination that would be sufficient to supplant the at-will termination rule. Moreover, *any* contract is terminable upon mutual agreement of the parties.

Furthermore, in making an *Erie* guess, "we may look to the decisions of intermediate appellate state courts for guidance."[30]  In *Rico Industries, Inc. v. TLC Group, Inc.,* an Illinois appellate court examined an almost identical provision to the one presented herein.[31]  The provision read as follows: "Any change to, cancellation of, or termination of this Agreement shall be null and void unless [the parties] mutually agree in writing to do so."[32]  The court held that based on its reading of *Jespersen*, "perpetual contracts are contrary to public policy."[33]  The court further held that "agreements that are terminable only by the mutual agreement of the parties are contracts of indefinite duration and, thus, terminable at will."  *Rico* further supports our conclusion that the handling-carrier relationship between PNR and BNSF is terminable at will.

BNSF argues that *Jespersen* and *Rico* are distinguishable from the contract at issue here because the contracts in those cases were "simple agreements" between a manufacturer and a sales representative.  BNSF asserts that its contract with PNR does not allow for unilateral termination because the parties' "rail lines are physically connected, and they must continue interconnecting to transport freight under their common-carrier obligations."  BNSF does not explain how termination of the handling-carrier relationship results in either its inability or PNR's inability to continue serving rail customers.  Termination of the handling-carrier relationship will not prevent or prohibit BNSF's customers from being able to use the Borger Line.

---

[30] *ExxonMobil Corp.*, 868 F.3d at 414 (internal quotation marks and citation omitted).
[31] 6 N.E.3d 415, 416–17 (Ill. App. 1st 2014).
[32] *Id.* at 417.
[33] *Id.* at 420.

No. 18-11416

As the owner, operator, and common carrier of the Borger Line, PNR has the obligation to provide rail service upon reasonable request and the authority to set rates and bill customers for the rail services it provides on its line.[34] BNSF has the same obligation and authority with respect to its own rail line. Customers needing service on both lines will now receive two bills for interline service instead of one. BNSF fails to persuade us that termination of the handling-carrier relationship would prevent either railroad from fulfilling its common-carrier obligations.

Like the parties in *Jespersen*, PNR and BNSF enjoyed a long and presumably profitable relationship, which lasted twenty-three years. They expressly drafted a contract that had no durational term for the handling-carrier relationship and described the obligations in that relationship as "continuing." The parties also specifically chose Illinois law as the law applicable to their Agreement and presumably knew that the courts of Illinois had long followed the general rule that contracts of indefinite duration are terminable at will. Contrary to BNSF's contention, application of the at-will termination rule does not mean that PNR could have terminated the handling-carrier relationship the day after the Closing. As stated by the *Jespersen* court, it means that PNR could "terminate the agreement for any reason or no reason without committing a breach of contract."[35] The question of *when* a party to a contract of indefinite duration can lawfully terminate the contract presents a different inquiry. Under Illinois law, contracts of indefinite duration "may be held to continue for a reasonable time under the circumstances."[36] BNSF has never argued that a period of twenty-three years was not a reasonable time for

---

[34] *See* § 1101.

[35] *Jespersen*, 700 N.E.2d at 1017.

[36] *Adkisson v. Ozment*, 370 N.E.2d 594, 598 (Ill. App. 5th Dist. 1977) (citation omitted) (holding that period of 18 years was "reasonable time, under the circumstances").

the handling-carrier relationship to last.

BNSF argues, as the district court determined, that its sale of the Borger Line cannot be separated from the handling-carrier arrangement with PNR and that consequently PNR had no right to terminate the arrangement unilaterally.[37] We disagree. The sale of the Borger Line was completed by BNSF's executing a quitclaim deed to PNR at the Closing. PNR obtained full ownership (fee title) of the Borger Line at that time. Nothing in the 1993 Agreement or in the quitclaim deed states that PNR's ownership of the line was conditioned on the handling-carrier arrangement.[38] The merger clause upon which the district court relied does not indicate otherwise.

BNSF asserts that railroad transactions have special public policy concerns and that permanent arrangements are generally considered to be in the interests of the railroads and the public. In making this argument, however, BNSF relies on a 1958 case which did not involve a handling-carrier agreement but instead a large railroad terminal in Chicago.[39] The Illinois appellate court held that the long-term lease at issue was consistent with specific state statutory law calling for consolidation of railroad terminals and facilities.[40] We see no parallel to this matter.

BNSF additionally argues that the "economic context" of the 1993 Agreement further supports its interpretation. Specifically, BNSF contends that at-will termination of the handling-carrier relationship makes no

---

[37] By way of its alternative claim for rescission, BNSF makes the companion argument that if the handling-carrier arrangement can be terminated, then the sale of the Borger Line should be rescinded.

[38] Consequently, BNSF's claim for rescission of the sale is similarly without merit. We also note that the agreements do not contain any type of buy-back provision, right of first refusal, or like provision in the event the handling-carrier arrangement were terminated.

[39] *See Illinois Cent. R. Co. v. Michigan Cent. R. Co.*, 152 N.E.2d 627 (Ill. App. 1st Dist. 1958).

[40] *Id.* at 642.

commercial sense in light of "the consideration the parties exchanged" and "the pricing rights retained." It points to the provisions in the Agreement stating that the "consideration" inducing the parties to enter the Agreement "includes all of the commitments" each party owes to the other as set forth in the Agreement. BNSF asserts it is unreasonable for PNR "to take BNSF's retained pricing rights, which were never part of the consideration."

BNSF's argument is flawed in several respects. First, there is nothing in the 1993 Agreement or in the quitclaim deed providing that BNSF "retained" some type of servitude, easement, or encumbrance on the line that entitled BNSF to set rates over the Borger Line after it sold the line to PNR. BNSF's rate-setting authority resulted from PNR's agreement to the handling-carrier arrangement which governed the parties' relationship going forward after PNR obtained full ownership of the line. Therefore, BNSF's contention that when PNR unilaterally terminated the handling-carrier relationship, it "took" BNSF's "retained pricing rights" has no merit.

Second, BNSF's argument that the price paid by PNR for its purchase of the Borger Line was not "adequate" consideration and that the "primary" consideration was a "continuing handling-carrier obligation" would require us to evaluate not only the value of the land and assets sold, but also the value BNSF received from the twenty-three years the handling-carrier relationship lasted. Not only would that task be far too speculative for this court to undertake, but it is also not required under Illinois law. In any event, it is apparent from the jury's award of $900,000 to BNSF for a year and a half of past contract injury that BNSF gained substantial profit from the handling-carrier relationship over the past twenty-three years.

As aforementioned, in making an *Erie* guess, we must determine, in our best judgment, how we believe the Illinois Supreme Court would resolve whether the handling-carrier relationship between PNR and BNSF is

17

terminable at will.  And, as reflected in the *Jespersen* decision, careful analysis of the text of the contract is paramount in making such a determination. Moreover, in the cases BNSF relies upon, the courts discussed the economics of the parties' agreements only after first examining closely the text of the contracts at issue and determining that there were termination provisions sufficient to take the contracts of indefinite duration out of the general rule of at-will termination.[41]  Although the courts could have ended their decisions upon making those determinations, they then went on to discuss the economics of the parties' agreements to further bolster their decisions that the contracts were not terminable at will.[42]  In this matter, as discussed above and unlike the cases relied upon by BNSF, there is no termination provision that is sufficient to take the handling-carrier arrangement of indefinite duration out of the general rule of at-will termination.[43]

---

[41] *See Burford v. Accounting Practice Sales, Inc.*, 786 F.3d 582, 586 (7th Cir. 2015) (acknowledging that *Jespersen* requires "close parsing of the contract language" and determining that contract language was sufficient to supplant the at-will termination rule because contract "said [one party] could terminate the contract only if [other party] violated it."); *Baldwin Piano, Inc. v. Deutsche Wurlitzer GMBH*, 392 F.3d 881, 882–83 (7th Cir. 2004) (holding that specific language of the contract placed "substantive restrictions" on the "reasons for termination" of the agreement between the parties).

[42] *See Burford*, 786 F.3d at 587–88 (discussing economics of a sales representative's contract); *Baldwin Piano, Inc.*, 392 F.3d at 885 (discussing economics of a "trademark license" versus a "distribution contract").

[43] BNSF further points out that the district court determined that PNR's interpretation of the handling-carrier relationship would lead to an "absurd result" because it would mean that BNSF "sold the Borger Line at 'salvage value' . . . but did not otherwise receive the long term benefit of a continuing handling carrier relationship and retained rate-making authority."  As we have noted, the specific language of the contract, and not the economics of BNSF's sale of the Borger Line to PNR, is essential in determining whether the general rule of at-will termination applies to a contract of indefinite duration under Illinois law.  Furthermore, the district court did not acknowledge the benefit BNSF received from the twenty-three years the handling-carrier relationship lasted.  BNSF asserts that it would never have sold the Borger Line for just salvage value.  In doing so, it does not recognize that it did more than that.  It sold the Borger Line and contracted for a handling-carrier relationship following the sale.  In that way, BNSF was able to receive the purchase price (which is the only amount it would have received if it could have abandoned the rail line) plus the opportunity to generate additional revenue with a handling-carrier arrangement.  The

No. 18-11416

Lastly, BNSF contends that its "prior performance" of its contractual obligations precludes application of the at-will termination rule. BNSF asserts that it fully performed when "it conveyed the Borger Line and local freight business to PNR in 1993. All that remained under the Agreement was for PNR to discharge its continuing obligation to act as BNSF's handling carrier." BNSF's argument would mean that the sale of the Borger Line was not completed at the Closing and that the sale involved cash consideration plus some type of installment arrangement wherein PNR's handling services, which would be rendered indefinitely, constituted the remainder of the "payment" for the line.

Pretermitting whether such a conditional sale could even be confected under Illinois law, there is no language in the 1993 Agreement, or in the quitclaim deed, establishing such an installment type of sale contract. Moreover, the unpublished order from the Seventh Circuit upon which BNSF relies, like the other Seventh Circuit decisions discussed above, determined that the contract at issue was not terminable at will based on the specific language of the contract—"the terms of the durational paragraph" were "far from creating a contract terminable at will." [44] Rather, the parties "agreed they would measure their obligation by reference to specific, external events." [45] There is no comparable language in the Agreement between BNSF and PNR. Consequently, BNSF's argument is unavailing. [46]

---

proof BNSF produced at trial regarding the damage it suffered during just one and half years without the handling-carrier arrangement shows that BNSF benefitted much more from a sale with handling-carrier arrangement rather than simple abandonment. BNSF's attempt to characterize the deal as one-sided is unpersuasive.

[44] *See Yale Security, Inc. v. Freedman Sales, Ltd.*, 165 F.3d 34 (7th Cir. 1998) (unpublished order).

[45] *Id.*

[46] In the last paragraph of its brief, BNSF requests this court to remand if we determine that PNR had a right to terminate unilaterally the handling-carrier relationship, so that the district court can consider its claims for "rescission and other breaches." As

No. 18-11416

## **IV. Conclusion**

Based on the foregoing reasons, we hold that the handling-carrier relationship created by the 1993 Agreement between PNR and BNSF is terminable at will.  We further hold that PNR consequently was entitled to terminate the relationship unilaterally upon reasonable notice to BNSF and that PNR did not breach the Agreement when it gave such notice to BNSF in September 2016.  Therefore, we REVERSE the district court's judgment and RENDER judgment in favor of PNR.

---

detailed above, however, the sale of the Borger Line was not dependent on the handling-carrier relationship, and BNSF is not entitled to rescind the sale based on PNR's lawful termination of that relationship.